**DENVER AREA LABOR FEDERATION, AFL–CIO, a Colorado Corporation, and Jack Hawkins, Petitioners,**

v.

**Victoria BUCKLEY, Secretary of State for the State of Colorado, and Colorado Compensation Insurance Authority, Respondents.**

No. 95SC314.

Supreme Court of Colorado, En Banc.

Sept. 23, 1996.

Dallas, Holland & O'Toole, P.C., Neil D. O'Toole, Denver, for Petitioners.

Gale Norton, Attorney General, Timothy M. Tymkovich, Solicitor General, Maurice Knaizer, First Assistant Attorney General, State Services Section, Denver, for Respondent Secretary of State.

Curt Kriksciun, Colorado Compensation Insurance Authority, Denver, for Respondent Colorado Compensation Insurance Authority.

Justice KIRSHBAUM delivered the Opinion of the Court.

In *Denver Area Labor Federation v. Meyer,* 907 P.2d 638 (Colo.App.1995), the court of appeals affirmed a judgment of the Denver District Court affirming an order entered on February 3, 1993, by the Secretary of State (the Secretary) [1] dismissing a complaint filed by the plaintiffs-petitioners Denver Area Labor Federation, AFL–CIO, and Jack Hawkins (the petitioners) against the defendant-respondent Colorado Compensation Insurance Authority (the Authority). The petitioners alleged in the complaint that the Au-

---

1. Natalie Meyer was the Secretary of State of Colorado prior to the filing of this appeal. Victo-
ria Buckley, successor to Natalie Meyer, has been substituted as the respondent to this appeal.

thority violated the Campaign Reform Act of 1974, sections 1–45–101 to –123, 1B C.R.S. (1980 & 1994 Supp.) (the Act), and exceeded its statutory authority in making contributions in kind or contributions of public moneys for the purpose of opposing a proposed amendment to the Colorado Constitution. A divided panel of the court of appeals determined that the Authority did not violate section 1–45–116(1)(a), 1B C.R.S. (1994 Supp.), of the Act because the contributions did not constitute contributions of public moneys or prohibited contributions in kind. Having granted certiorari to review the propriety of the court of appeals' decision, we reverse and remand with directions.[2]

## I

The petitioners filed a petition with the Secretary to include on the 1992 state ballot a proposed amendment to the Colorado Constitution entitled the "Safe Work Environment Amendment." An organization, the Coalition to Save Colorado Jobs (the Coalition), was formed to defeat the proposed amendment. The Authority printed articles opposing the proposed amendment in its publication and, on behalf of the Coalition, purchased posters prepared by the Coalition and distributed them to employers. In addition, the Coalition filed reports with the Secretary indicating that the Authority had made contributions to the Coalition.

On December 15, 1992, the petitioners filed a verified complaint with the Secretary pursuant to section 1–45–113(2) of the Act alleging that the Authority, as a political subdivision of the state, violated the Act and exceeded its statutory authority in making these contributions. On December 17, 1992,

the Authority filed a motion to dismiss the complaint on the grounds that the contributions did not constitute contributions of "public moneys" or prohibited contributions in kind because the Colorado compensation insurance authority fund administered by the Authority consists primarily of premiums paid into the fund by employers for the purchase of workers' compensation insurance. The Authority also argued that the determination of whether the Authority exceeded its statutory authority in making the contributions was not within the jurisdiction of the Secretary. The Secretary agreed with these arguments and on February 3, 1993, entered an order dismissing the complaint.

The petitioners filed a complaint in the district court seeking review of the Secretary's order, pursuant to section 24–4–106(4), 10A C.R.S. (1988). By order dated February 8, 1994, the district court affirmed the Secretary's decision. The petitioners appealed to the court of appeals, which court affirmed the district court's judgment. The court of appeals determined that the fund administered by the Authority does not consist of "public moneys" for purposes of the Act. *Denver Area Labor Federation,* 907 P.2d at 640–41. The court of appeals also determined that the Act does not prohibit contributions in kind which derive from moneys which are not "public moneys." *Id.* at 641.

## II

■ The petitioners argue that the moneys in the fund administered by the Authority constitute "public moneys" for purposes of section 1–45–116(1)(a), 1B C.R.S. (1994 Supp.).[3] We agree.

2. We granted review of the following three issues:

 1. Whether the court of appeals erred when it found that the Campaign Reform Act's prohibition against political subdivisions spending "public moneys" to support or oppose issues before the electorate, § 1–45–116(1)(a), 1B C.R.S. (1994 Supp.), does not apply to the Colorado Compensation Insurance Authority.
 2. Whether the court of appeals erred when it found that § 1–45–116(1)(a), 1B C.R.S. (1994 Supp.), of the Campaign Reform Act, which prohibits "in kind" contributions by political subdivisions, does not apply to the Colorado Compensation Insurance Authority.

 3. Whether § 8–45–101(5)(i) limits the political activities of the Colorado Compensation Insurance Authority to reviewing and recommending legislation pertaining to workers' compensation and does not permit any other political activity under the doctrine of inclusio unius est exclusion [sic] alterius.
In view of our disposition of the first issue, we do not address the second and third issues.

3. The issues raised by the parties require construction of certain provisions of § 1–45–116(1)(a), 1B C.R.S. (1994 Supp.). Unless otherwise specified, references in this opinion to § 1–45–116(1)(a) refer to the language of that statute.

Section 1–45–116(1)(a) contains the following pertinent language:

**State and political subdivisions—limitations on contributions.** (1)(a) No agency, department, board, division, bureau, commission, or council of the state or any political subdivision thereof shall make any contribution or contribution in kind in campaigns involving the nomination, retention, or election of any person to any public office, nor shall any such entity expend any public moneys from any source, or make any contributions in kind, to urge electors to vote in favor of or against any issue before the electorate....

Section 1–45–116(1)(a) thus prohibits certain entities from expending "public moneys from any source" to urge electors to vote in a particular manner on issues before the electorate.

 In construing the language of a statute, courts must ascertain and give effect to the intent of the General Assembly in enacting the statute. *Boatright v. Derr,* 919 P.2d 221, 224 (Colo.1996); *Colorado Common Cause v. Meyer,* 758 P.2d 153, 160 (Colo. 1988). To determine such intent, courts should first look to the statutory language giving words and phrases their commonly understood meaning. *Colorado Common Cause,* 758 P.2d at 160. If the language of that statute is reasonably susceptible to more than one meaning, courts should construe the language in light of the objective sought to be achieved. *Id.* Moreover, a statute should be construed so as to give consistent, harmonious, and sensible effect to all of its parts. *Id.*

 The Act prohibits the expenditure of "public moneys from any source" for certain purposes. While the term "public moneys" is not defined, the all-inclusive language "from any source" indicates that the General Assembly intended an expansive definition of

the phrase. Thus, the term "public moneys" may not be construed to refer only to sums realized from the imposition of taxes. Given the broad sweep of this term, any effort to determine whether certain moneys constitute public moneys for purposes of the Act by reference solely to the source of such moneys would prove futile.

The Authority and the Secretary rely upon our decision in *Stong v. Industrial Commission,* 71 Colo. 133, 204 P. 892 (1922), in support of their argument that the fund administered by the Authority does not consist of public moneys for purposes of section 1–45–116(1)(a) of the Act. That case is readily distinguishable, however. In *Stong,* we determined that because the state compensation insurance fund administered by the industrial commission did not constitute part of the state treasury, a district court's order requiring the state treasurer as custodian of the fund to obey the directions of the industrial commission regarding investment of fund moneys in United States bonds did not encroach upon the state treasurer's constitutional power over the state treasury. *Id.* at 136, 204 P. at 893. The question presented here is not whether the moneys of the workers' compensation fund are part of the state treasury but whether those moneys are "public moneys" for purposes of section 1–45–116(1)(a) of the Act. The Act expressly applies not only to discrete state entities but also to all political subdivisions of the state. A conclusion that moneys contained in the account or fund of a political subdivision do not constitute "public moneys" for purposes of section 1–45–116(1)(a) would render meaningless the prohibition of the use of public moneys by political subdivisions.

The parties do not dispute that the Authority is a political subdivision of this state and enjoys governmental immunity. *See* § 8–45–101(1), 3B C.R.S. (1995 Supp.); § 24–

Section 1–45–116(1)(a) prohibits the expenditure of public moneys "to urge electors to vote in favor of or against any issue before the electorate." In 1995, § 1–45–116(1)(a) was amended to prohibit the expenditure of public moneys "to urge electors to vote in favor of or against any ... [s]tatewide ballot issue that has been submitted for the purpose of having a title designated and fixed pursuant to section 1–40–106(1) or that

has had a title designated and fixed pursuant to that section." § 1–45–116(1)(a)(I), 1B C.R.S. (1995 Supp.). In its brief in opposition to the petition for certiorari, the Authority asserted that proponents of the "Safe Work Environment Amendment" did not secure a sufficient number of petition signatures for the proposed amendment to appear on the 1992 state ballot.

10–103(5), 10A C.R.S. (1995 Supp.). While moneys collected by the Authority are not derived from state-imposed sales, use, property, or income taxes, those moneys may be spent by the Authority only for authorized public purposes. The General Assembly has in essence declared that the expenditure of moneys in the fund for purposes prohibited by section 1–45–116(1)(a) are not authorized expenditures for public purposes.

The court of appeals referred to our decision in *Pensioners Protective Association v. Davis*, 112 Colo. 535, 150 P.2d 974 (1944), in the course of its decision. In *Davis*, we concluded that an award of attorney fees satisfied from moneys taken from the old age pension fund did not constitute a recovery against the state and, therefore, was not barred by the doctrine of sovereign immunity. *Id.* at 539–40, 150 P.2d at 976. In the course of reaching that conclusion, we determined that moneys comprising the old age pension fund did not constitute "public funds" belonging to the state. *Id.* at 540, 150 P.2d at 976. The court of appeals in this case stated that the General Assembly is presumed to be aware of our interpretation of the term "public funds." *Denver Area Labor Federation*, 907 P.2d at 640–41.

It must first be observed that section 1–45–116(1)(a) prohibits the use of "public moneys from any source," not the use of "public funds." The General Assembly thus selected a phrase not previously construed by this court in seeking to limit the expenditure of funds by various governmental entities for certain purposes. It is noteworthy that the General Assembly has defined the term "public funds" quite broadly in another statute to include not only those funds belonging to a public entity but also any funds "in the custody, possession, or control of a public entity." *See* § 24–75–601(2), 10B C.R.S. (1995 Supp.).

Furthermore, the question presented here is not whether the moneys of the workers' compensation fund are "public funds" that belong to the state. As we have indicated, section 1–45–116(1)(a) of the Act applies to several specified entities, including political subdivisions of this state, such as the Authority.[4] The declared purpose of the Act as initially adopted is to "promote public confidence in government through a more informed electorate." § 1–45–102, 1B C.R.S. (1980). Section 1–45–116(1)(a) tends to promote public confidence in government by prohibiting the use of moneys authorized for expenditure by political subdivisions for specified public purposes to advance the personal viewpoint of one group over another.[5] In

---

**4.** Legislative history supports the determination that the General Assembly's use of the term "public moneys" was intended to designate those moneys under the control of the public entities specified in § 1–45–116(1)(a), as evidenced by the following comments by bill sponsor Representative Green:

> Currently a public entity cannot give any money to a candidate for their retention, nomination or whatever, but they can put money into a ballot issue and there's nothing to prohibit them from putting money in on one side of the issue or the other.
>
> What the intent of my bill is is that they will be able to put money in to present an even, balanced, non-biased report of the facts on both sides of the issue so that the electorate will be informed, but that they cannot take one side or another and promote it. . . .

Hearings on H.B. 1179 Before the House Committee on State Affairs, 56th Gen. Assembly, 2d Reg. Sess., Feb. 11, 1988. Furthermore, use of the term "public moneys" serves the purpose of distinguishing such moneys from the personal moneys of those who serve in governmental office, as is further evidenced by the following statements by Representative Green:

> [W]hat the bill does is it only deals with contributions and contributions in kind in prohibiting anyone from using those moneys to advocate, to take an advocate position on a ballot issue.
>
> It does not prohibit by the definition of contribution or contribution in kind in the current statute an individual person using their own time. It only deals with public money or public time.

Hearings on H.B. 1179 Before the House Committee on State Affairs, 56th Gen. Assembly, 2d Reg. Sess., Feb. 11, 1988. There is no suggestion from these remarks that moneys such as those contained in the workers' compensation fund were not intended to constitute public moneys for purposes of § 1–45–116(1)(a) of the Act.

**5.** In introducing the bill, Representative Green made the following comments: "I think it's basic democratic principles, fundamental principles, that the government should use the funds to represent everybody and we should not give one group an unfair advantage over another group when we're referring something to the electorate." Hearings on H.B. 1179 Before the House Committee on State Affairs, 56th Gen. Assembly, 2d Reg. Sess., Feb. 11, 1988.

this case, the Authority used moneys authorized for expenditure for the benefit of an insured to oppose the passage of an amendment proposed by an insured. The General Assembly intended by the enactment of section 1–45–116(1) to prohibit such conduct. In light of the purpose of the Act, the General Assembly's intent to subject all political subdivisions to its provisions, and the broad sweep of the phrase "public moneys from any source," we conclude that the moneys of the fund administered by the Authority constitute "public moneys" for purposes of section 1–45–116(1)(a) of the Act.

### III

For the foregoing reasons, we reverse the judgment of the court of appeals. The case is remanded to that court with directions to return the case to the district court with directions to remand to the Secretary for further proceedings consistent with this opinion.

VOLLACK, C.J., dissents.

Chief Justice VOLLACK, dissenting:

The majority holds that the language of section 1–45–116(1)(a), 1B C.R.S. (1996 Supp.) of the Campaign Reform · Act (the CRA) should be read broadly to include all political entities which collect and manage private funds, thereby preventing these organizations from engaging in certain political activities. I dissent because I believe the language of section 1–45–116(1)(a) does not include these entities. I would hold that the Colorado Compensation Insurance Authority (the CCIA) falls outside the reach of section 1–45–116(1)(a) of the CRA because it is a hybrid political organization managing a purely private fund for the benefit of a private constituency.

### I.

In 1992, the "Safe Work Environment Amendment" (the Amendment) was included on the general election ballot. In response, the Coalition to Save Colorado Jobs (the coalition) was organized to defeat the Amendment. The CCIA, which supported the coalition's efforts, spent approximately $30,000 out of the Colorado compensation insurance fund (the fund) to publish negative editorials in its newsletter and send out posters to subscribers urging them to vote against the Amendment.

In December 1992, the Denver Area Labor Federation, AFL–CIO, and Jack Hawkins (the petitioners) filed a verified complaint with the Secretary of State against the CCIA. The complaint alleged that the CCIA expenditures used to defeat the Amendment violated the CRA as unlawful contributions in kind. The CCIA filed a motion to dismiss the complaint on grounds that the CRA prohibition on contributions in kind did not apply to political entities managing private funds.

The Secretary of State granted the motion to dismiss, finding that the CCIA had not violated the CRA. The Court of Appeals agreed, holding that while the CCIA funds "are held in public trust for specified statutory purposes, those funds do not constitute public money." *Denver Area Labor Fed'n v. Meyer,* 907 P.2d 638, 641 (Colo.App.1995).

### II.

#### A.

The majority reverses the Court of Appeals, holding that the language of section 1–45–116(1)(a) applies to the CCIA. Section 1–45–116(1)(a) provides:

No agency, department, board, division, bureau, commission, or council of the state or any political subdivision thereof shall make any contribution or contribution in kind in campaigns involving the nomination, retention, or election of any person to any public office, nor shall any such entity expend *any public moneys from any source,* or make any contributions in kind, to urge electors · to vote in favor of or against any:

(A) Statewide ballot issue . . .;

(B) Local ballot issue . . .;

(C) Referred measure . . .;

(D) Measure for a recall of any officer....

(Emphasis added.)

The majority interprets the statute's "from any source" language highlighted above as an indication that the General Assembly intended an expansive definition of the term "public moneys" to include political entities completely funded with private money. Maj. op. at 527. I dissent because I believe the plain language of the CRA requires that the "moneys" spent be "public." In my view, the CCIA is a hybrid political entity managing a private fund to further the interests of its private membership. For this reason, I would hold that the CRA does not apply because the money spent by the CCIA on in kind campaign contributions is not public money within the meaning of the CRA.

### B.

The state compensation insurance fund was created with the passage of the original workers' compensation statute in 1919 and was subsequently renamed the Colorado compensation insurance fund in 1990. It consists of (a) premiums paid by employers to insure them against workers' compensation claims, (b) all property and securities acquired by the fund, and (c) any interest earned on those assets. § 8–45–102(4), 3B C.R.S. (1996 Supp.).

The state treasurer serves as custodian of the fund subject to the direction of the CCIA fund manager (the manager) and the CCIA board of directors (the board). § 8–45–118(1), 3B C.R.S. (1996 Supp.). The state treasurer is prohibited from transferring fund moneys into the general fund of the state at the close of the fiscal year. § 8–45–102(5), 3B C.R.S. (1996 Supp.). Furthermore, section 8–45–114, 3B C.R.S. (1996 Supp.), authorizes the fund to repay or credit estimated premiums paid by employers in excess of actual premiums.

The State Compensation Insurance Authority (SCIA) was created in 1986 to manage and administer the fund and became the CCIA in 1990. The CCIA consists of a seven-member board of directors appointed by the governor with the consent of the senate. § 8–45–101(2)(a), 3B C.R.S. (1996 Supp.). The board's membership is made up of four employer representatives, two employee representatives and one representative "experienced in the management and operation of insurance companies." Id.[1] The board's duties include appointing the fund manager, developing an annual budget, establishing rules and regulations concerning the operation of the fund and premium determinations, and reviewing and recommending legislation relating to workers' compensation as well as clarifying legal concepts therein. § 8–45–101(5), 3B C.R.S. (1996 Supp.).

While the CCIA is "a corporate body and a political subdivision of the state" and enjoys liability protection under the Colorado Governmental Immunity Act as well as inclusion in the risk management fund, it is not an agency of state government. § 8–45–101(1), 3B C.R.S. (1996 Supp.).

Both the fund and the CCIA operate in much the same manner as a private insurance company. Employers pay premiums to the fund, claims are received and processed by the CCIA, and disbursements are made to claimants out of the fund. See § 8–45–115, 3B C.R.S. (1996 Supp.); § 8–45–118, 3B C.R.S. (1996 Supp.). The CCIA, like private insurance companies, is subject to regulation by the commissioner of insurance. See § 8–45–117, 3B C.R.S. (1996 Supp.). The fund manager is authorized to exercise his power in the same manner "as the head of a private insurance company." § 8–45–102(2), 1B C.R.S. (1996 Supp.).

Clearly, the legislature set up both the CCIA and the fund to operate as private entities within the state government and

---

**1.** The SCIA board underwent several structural changes in the years prior to 1990, yet always maintained a majority of employer representatives. See § 8–54–102.5(2), 3B C.R.S. (1986) (three employer representatives on five-member board); § 8–54–102.5(2) (1987 Supp.) (four employer representatives on six-member board);

§ 8–54–102.5(2)(a) (1989 Supp.) (four employer representatives on seven-member board).

By creating and maintaining a majority of employer representatives on the board, the General Assembly clearly intended the CCIA to serve primarily as an agent for employers in the workers' compensation scheme.

serve a specific constituency made up of premium paying employers. By informing its membership of an upcoming ballot initiative, the CCIA was acting as the agent for its paying customers.

## C.

The CRA was passed to "promote public confidence in government through a more informed electorate." § 1–45–102, 1B C.R.S. (1980). The General Assembly believed that through public disclosure and the regulation of certain campaign practices, it could create a more informed electorate, thus promoting public confidence in government. *Id.*

The original CRA prohibited political entities from making contributions or contributions in kind to campaigns involving candidates for public office, but allowed contributions and contributions in kind to campaigns involving issues in which the political entity had an "official concern." § 1–45–116, 1B C.R.S. (1980). The CRA was amended in 1988 to prohibit public entities from expending "any public moneys, from any source, or make contributions in kind, to urge electors to vote in favor of or against any issue before the electorate." § 1–45–116, 1B C.R.S. (Supp. 1988).

The majority interprets the phrase "public moneys from any source" in section 1–45–116(1)(a) to include all moneys held by political entities regardless of their source. In so doing, the majority states that "the term 'public moneys' may not be construed to refer only to sums realized from the imposition of taxes." Maj. op. at 527.

The majority's interpretation overlooks the myriad of sources of public funds besides tax revenue such as fines, tolls, escheats, and federal grants. A more reasonable interpretation of the "public moneys from any source" language would first require that the money spent on political contributions be "public" before disregarding the various

sources of those public funds. It would follow that private money outside the reach of the general fund would not fall within the CRA's prohibition on contributions in kind.[2]

This interpretation is consistent with relevant case law. In *Stong v. Industrial Commission,* 71 Colo. 133, 204 P. 892 (1922), this court held that the state treasurer did not have the authority to manage the state compensation insurance fund because the fund consisted of money separate from the general fund. The *Stong* court stated:

> Full control of the fund is given to the Commission; the custodian [the treasurer] is authorized to do nothing with it except upon their order....
>
> ....
>
> ... [Y]et the constitution is not violated, because the fund in question is not the general property of the state and its custody is no part of the treasurer's constitutional duty but is conferred on him by statute only. The fund is not "creditable to the general revenue of the state" and is "designated for purposes other than such general revenue," and so is not in the treasury of the state.

*Stong,* 71 Colo. at 135–36, 204 P. at 893 (citation omitted).

Similarly, in *Pensioners Protective Association v. Davis,* 112 Colo. 535, 150 P.2d 974 (1944), we held that a pension fund administered by the State Board of Public Welfare was subject to an award of attorney fees because there was no public money in the fund. The *Davis* court pointed out that:

> The fund is not dependent upon legislative appropriation. *The state, in its sovereign capacity, has and can have, no interest therein* .... The moneys involved are not public funds. They stand segregated for a special and designated use. The term public funds means funds belonging to the state. *The term does not apply to special funds, which are collected or voluntarily contributed, for the sole benefit of the con-*

---

**2.** It is true that, for public investment purposes, the term "public funds" is defined in § 24–75–601(2), 10B C.R.S. (1996 Supp.) as "any funds in the custody, possession, or control of a public entity." However, as the court of appeals explains, this definition is not dispositive because it

was not incorporated into the CRA. *Denver Area Labor Fed'n,* 907 P.2d at 641. Furthermore, the General Assembly declined to make CCIA investments subject to § 24–75–601(2). 907 P.2d at 641.

*tributors, and of which the state is merely the custodian.*

*Davis,* 112 Colo. at 540, 150 P.2d at 976 (emphasis added).

As *Stong* and *Davis* make clear, the state has no interest in funds derived from private sources. The state, therefore, has no authority to prevent the CCIA from spending private moneys in support of, or against, a campaign issue.

#### D.

The CRA legislative history cited by the majority is ambiguous as to whether the term "public moneys" includes funds derived from purely private sources and held apart from the general fund. Maj. op. at p. 528, n. 4. These passages only address the use of general or individual funds to advocate a position on a ballot issue and shed no light on the issue presented by this case. *Id.*

During the floor debate on the bill to amend section 1–45–116(1)(a), Representative Green, the bill's sponsor, stated that she was concerned with government entities using publicly owned and collected funds to advocate a position on a ballot issue. Representative Green stated:

> I don't think it's appropriate that we be using *taxpayers money* to push one side of an issue.... It's not fair to take one group of taxpayers and elevate them above another group of taxpayers.

H.B. No. 1179, 56th Gen. Assembly, 2d Reg. Sess., (Feb. 24, 1988) (emphasis added). Later, Representative Owens reaffirmed this idea:

> I think the important point is that we shouldn't be letting *taxpayer funds* be used on one side or the other of these issues. Representative Green's bill will simply insure the government's neutrality on these issues.

---

3. District Judge Matsch had this to say about the expenditure of public funds for issue campaigning in a case dealing the original language of § 1–45–116:
> A use of the power of publicly owned resources to propagandize against a proposal made and supported by a significant number of those who were taxed to pay for such resources is an abridgment of ... fundamental

H.B. No. 1179, 56th Gen. Assemb., 2d Reg. Sess., (Feb. 24, 1988) (emphasis added).

In her remarks to the house committee, Representative Green also compared the bill to section 43–4–512, 17 C.R.S. (1996 Supp.), a provision concerning public highway authorities which provides:

> No moneys of the authority may be used to urge or oppose passage of an election to establish or increase any tax or annual motor vehicle registration fee....

If this provision was used as a model for section 1–45–116, then the inclusion of the word "public" to modify "moneys" in section 1–45–116 further suggests that the General Assembly sought to prohibit only publicly funded government entities from making in kind contributions. Additionally, if the General Assembly wished to include privately funded entities such as the CCIA in this prohibition, it could have applied the same "[n]o moneys" language contained in section 43–4–512 to section 1–45–116.

The emphasis on "public money" in the wording of section 1–45–116(1)(a) and in the legislative history of the CGA indicates that the General Assembly was concerned with public entities spending money earmarked for public use to influence ballot issues. Clearly, the bill's sponsors sought to prevent publicly funded entities from using public funds to advocate for or against ballot initiatives. The driving impetus behind section 1–45–116, as amended, was to insure that government remain neutral while its citizens participated in the democratic process.

#### III.

I agree with the majority that the use of public money to influence the passage of a proposed initiative violates core values in our democratic system and reduces public confidence in government.[3] However, a public

---

freedoms. Specifically, where the proposal in question—placed before the voters in the exercise of the initiative power—seeks fundamentally to alter the authority of representative government, opposition to the proposal which is financed by publicly collected funds has the effect of shifting the ultimate source of power away from the people....

entity designed to function as a private insurance company should be allowed to expend its private funds to politically mobilize its constituents for an upcoming ballot measure. Such a use of non-public funds does not offend democratic principles and does not run contrary to the CRA.

I dissent because I disagree with the majority's classification of the fund over which the CCIA operates as "public moneys" sub-

ject to section 1–45–116(1)(a) of the CRA. I would therefore affirm the court of appeals decision.

... When residents within a state seek to participate in this process by proposing an amendment to the state constitution, the expenditure of public funds in opposition to that effort violates a basic precept of this nation's democratic process. Indeed, it would seem so contrary to the root philosophy of a republican form of government as might cause this Court to resort to the guaranty clause in Article IV, Section 4 of the United States Constitution. *Mountain States Legal Found. v. Denver Sch. Dist. No. 1,* 459 F.Supp. 357, 360–61 (D.Colo.1978) (citations omitted).