**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**September 12, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

GLENN JOHNSON, individually and as personal representative of the Estate of Merry Johnson, deceased; JONATHAN JOHNSON,

     Plaintiffs - Appellants,

v.

FARMERS NEW WORLD LIFE INSURANCE COMPANY; WASHINGTON NATIONAL INSURANCE COMPANY,

     Defendants - Appellees,

and

MINNESOTA LIFE INSURANCE COMPANY,

     Defendant.

No. 23-1316
(D.C. No. 1:21-CV-02573-DDD-KAS)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **TYMKOVICH**, **MATHESON**, and **McHUGH**, Circuit Judges.

_____

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

This appeal involves a dispute about the scope of coverage under accidental death insurance policies defendants, Farmers New World Life Insurance Company (Farmers) and Washington National Insurance Company (WNIC), issued to Merry Johnson (Ms. Johnson).  After the insurers denied coverage, her husband, Glenn Johnson, individually and as personal representative of her estate, and her son, Jonathan Johnson (collectively, the Johnsons), filed suit, asserting claims for breach of contract and insurance bad faith.  The district court dismissed the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, concluding the policies excluded benefits for Ms. Johnson's death.[1]  The Johnsons appeal, and, exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  Factual Background[2]

To provide context for our discussion of the factual and procedural background, we begin by identifying the relevant policy provisions.

---

[1] The district court also dismissed the Johnsons' claims against a third defendant, Minnesota Life Insurance Company.  After this appeal was filed, Minnesota Life and the Johnsons reached a settlement and moved by stipulation to dismiss the appeal as to Minnesota Life.  We granted the motion, leaving Farmers and Washington National as the only two appellees.  *See* Fed. R. App. P. 42(b)(1).

[2] This factual history derives from the allegations in the Second Amended Complaint and the documents referenced in and attached to the complaint.  *See Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011) (noting that we "accept[] as true all well-pleaded factual allegations in the complaint" on an appeal from a motion to dismiss and "may consider not only the complaint, but also the attached exhibits and documents incorporated into the complaint by reference").

Farmers issued two accidental death insurance policies to Ms. Johnson (The Farmers Policies). Both provided that Farmers would pay benefits provided "[d]eath occurs as the direct result of an accidental bodily injury, independent of all other causes." R. at 42, 44. As pertinent here, the Farmers Policies excluded from coverage death that "is caused by, results from, or is contributed to by" "sickness or its medical or surgical treatment" (the sickness exclusion), or the "taking of any drug, medication, narcotic or hallucinogen unless as prescribed by a physician" (the drug exclusion). *Id.*

WNIC issued an accidental death policy to Ms. Johnson and Glenn Johnson that provided accidental death benefits coverage for her (the WNIC Policy). It defined an accidental injury as "bodily injuries solely caused by and resulting from an Accident," which the policy defined as "a sudden, unexpected and unforeseen event." R. at 70. "Accidental injury does not include injury as a direct or indirect result of bodily or mental infirmity or disease in any form or medical treatment of any kind." *Id.* Like the Farmers Policies, the WNIC Policy contained sickness and drug exclusions. Specifically, it excluded coverage for death "contributed to, caused by, or resulting from" her "[h]aving any disease, bodily or mental illness, or degenerative process . . . [or] related medical treatments," or "[b]eing legally intoxicated, or so intoxicated that mental or physical abilities are seriously impaired. . . , or being under the influence of any narcotic, unless such narcotic is taken under the direction of and as directed by a Physician" (the narcotics exclusion). R. at 75-76.

3

With those policy provisions in mind, we turn to the underlying facts.

Ms. Johnson died after taking hydrocodone and mitragynine, also known as Kratom. The hydrocodone, an opioid, was prescribed by her physician to treat chronic pain caused by severe gout. The complaint described Kratom as an "herbal/dietary supplement." R. at 110. She took it without a prescription "to help with her pain." *Id.* The coroner's report indicated that the cause of death was an "accident" resulting from "complications of combined hydrocodone and mitragynine toxicity." R. at 112.

The Johnsons, as beneficiaries of the policies, submitted claims for benefits. Farmers denied their claims under the drug exclusion. WNIC did not deny the claim but did not pay benefits because it was still requesting medical records.

**B. Procedural Background**

The Johnsons filed their complaint in Colorado state court. They alleged that Farmers' denial of their claims and WNIC's failure to respond to their claim breached the insurance contracts. The Johnsons also claimed both insurers' handling of the claims—including their alleged processing delays, failures to communicate with the Johnsons, and failure to adequately investigate the claims—constituted insurance bad faith.

Following removal of the case to federal court pursuant to 28 U.S.C. § 1332 based on diversity of citizenship, Farmers moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim, and WNIC moved to join Farmers'

4

motion.  For ease of reference, we refer to Farmers' motion to dismiss and WNIC's joinder together as the motions to dismiss.[3]

The district court granted the motions and dismissed the complaint in its entirety.  The court held that the Johnsons failed to state a claim for breach of contract because all of the policies excluded benefits for Ms. Johnson's death.  As for the Farmers Policies, the court held the allegations in the complaint established that the circumstances of her death fell within the exclusions for injuries caused in whole or in part by drugs or sickness because it was caused by her use of unprescribed Kratom (the drug exclusion) and prescribed hydrocodone to treat gout (the sickness exclusion).  Similarly, the court held that Ms. Johnson's death was not covered under the WNIC Policy because (1) it was the "direct or indirect result" of her prescribed use of hydrocodone to treat gout, so did not fall within the Policy's definition of "[a]ccidental injury," which excluded injuries resulting from "medical treatment," R. at 243 (quoting WNIC Policy); and (2) it was the result of her use of Kratom, which fell within the narcotics exclusion.  The court then concluded the Johnsons'

---

[3] Because WNIC had already filed an answer to the complaint when it joined in the motion to dismiss, the district court construed WNIC's joinder as a motion for judgment on the pleadings pursuant to Rule 12(c).  *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 at 2 (4th ed. 2009), Westlaw (database updated July 12, 2024) ("Technically . . . a post-answer Rule 12(b)(6) motion is untimely and . . . some other vehicle, such as a motion for judgment on the pleadings or for summary judgment, must be used to challenge the plaintiff's failure to state a claim for relief." (footnote omitted)).  However, a motion under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6).  *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).

bad faith claim failed as a matter of law because their allegations established that

Farmers and WNIC properly denied coverage.

## II.     STANDARD OF REVIEW

"Because this is a diversity case, we apply federal law to procedural questions

and apply the substantive law of the forum state, Colorado, to analyze the underlying

claims." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1099

(10th Cir. 2017).

We review de novo the dismissal of a complaint for failure to state a claim,

applying the same standards that applied in the district court. *See Cnty. of Santa Fe*

*v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1034 (10th Cir. 2002). To survive a

motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007)). We accept all well-pleaded facts as true, view them in

the light most favorable to the plaintiff, and draw all reasonable inferences in his

favor. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).[4]

Our duty is to "determine whether the complaint sufficiently alleges facts supporting

all the elements necessary to establish an entitlement to relief under the legal theory

proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

---

[4] The requirement that we accept well pled factual allegations as true "is
inapplicable to legal conclusions," *Ashcroft*, 556 U.S. at 678, so we are not bound by
the Johnsons' recital of legal principles.

6

### III.  DISCUSSION

On appeal, the Johnsons argue that the district court erred by concluding that coverage for Ms. Johnson's death was excluded under the Policies.  They thus argue that the court erred by concluding that Farmers and WNIC did not breach their contracts with the Johnsons and by dismissing their claims on that basis.

**A. Applicable Law**

Under Colorado law, to prevail on a claim for breach of an accidental death insurance policy, the beneficiary must prove coverage under the policy.  *See Sylvester v. Liberty Life Ins. Co.*, 42 P.3d 38, 39 (Colo. App. 2001).  The insurer has the burden to prove the applicability of an exclusion.  *Id.*  The insurer is entitled to judgment as a matter of law on a breach of contract claim if the policy does not cover the insured's loss.  *See MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1185, 1190 (10th Cir. 2009) (applying Colorado law in affirming summary judgment for insurer on breach of contract claim based on applicability of exclusion).  A bad faith claim fails as a matter of law if "coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage." *Id.* at 1193.  Thus, the issue before us is whether Farmers and WNIC properly denied coverage, and resolution of that question requires us to interpret the Policies.[5]

---

[5] WNIC failed to pay the Johnsons' claim, which, for our purposes, constitutes denial of the claim.  *See Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274-75 (Colo. 1985) (holding that an insurer's failure to pay a valid claim is a failure to perform under the insurance contract that can support a bad faith claim if the insurer lacked a reasonable basis for its failure to pay).

Insurance policies are subject to general rules of contract interpretation. *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1050 (Colo. 2011). The interpretation of a "contract and the determination of whether a provision in the contract is ambiguous are questions of law" that we review de novo. *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990); *see also Bailey*, 255 P.3d at 1050 (recognizing that insurance policies are reviewed de novo).

Colorado follows the doctrine of reasonable expectations in determining the meaning of insurance policies. *See Bailey*, 255 P.3d at 1049-51. The purpose of the doctrine is to ensures that insurers "fully and fairly convey[] the extent of coverage provided . . . and coverage limitations to insureds," *id.* at 1050, so that "the reasonable expectations of an ordinary individual purchasing the contract will be fulfilled," *id.* at 1051 (internal quotation marks omitted).

To that end, the Colorado Supreme Court has rejected the use of "technical readings," and has held that "insurance policies must be given effect according to the plain and *ordinary* meaning of their terms." *Id.* at 1050-51 (internal quotation marks omitted). The "plain and ordinary meaning" of an insurance contract is the one "a person of ordinary intelligence would attach to it." *Id.* at 1051 (internal quotation marks omitted). "If, based on how an ordinary, objectively reasonable insured would read the whole policy, the question of whether certain coverage exists is susceptible to more than one reasonable interpretation, then the coverage provisions are ambiguous" and must be construed against the insurer. *Id.* (internal citation and

8

quotation marks omitted).  Absent ambiguity, the policy's language is given its plain meaning.  *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007).

Colorado will not enforce an exclusionary provision "where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue." *Bailey*, 255 P.3d at 1050.  The "policy is construed as it would be understood by an ordinary insured," *id.* at 1051.  The insurer must show the exclusion is "not subject to any other reasonable interpretation[ ]." *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1090 (Colo. 1991); *see also Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1262 (Colo. 1998) (holding that where an insurer seeks to limit coverage through an exclusionary provision, the exclusion "must be written in clear and specific language").

### B. The district court correctly dismissed the claims against Farmers.

Farmers denied coverage under the drug exclusion based on Ms. Johnson having died, at least in part, as a result of taking Kratom.  The district court dismissed the claim against Farmers, concluding the Policies barred coverage under both the drug exclusion and the sickness exclusion.  The Johnsons argue neither exclusion applies.  We conclude that the drug exclusion applies and that the district court correctly dismissed the claims against Farmers on that basis.  We need not address whether the sickness exclusion applies and provides an additional basis for dismissal.

9

As noted above, the drug exclusion in the Farmers Policies excludes coverage for death that "is caused by, results from, or is contributed to by" the "taking of any drug, medication, narcotic or hallucinogen unless as prescribed by a physician." R. at 42, 44. The Johnsons do not dispute that Ms. Johnson's death was caused, at least in part, by her having taken Kratom. They argue, however, that the district court erred in concluding that Kratom is a drug within the meaning of this exclusion.[6]

The Policies do not define "drug," so we must look elsewhere to determine its plain and ordinary meaning. *See BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1177 (10th Cir. 2021). In doing so, we "may consider definitions in a recognized dictionary." *Renfandt v. N.Y. Life Ins. Co.,* 419 P.3d 576, 580 (Colo. 2018) (applying Colorado law). Such dictionaries include Black's Law Dictionary ("Black's"), the Oxford American Dictionary ("Oxford American"), and Merriam-Webster Online Dictionary ("Merriam-Webster").[7]

---

[6] Farmers argues that Kratom is not only a drug but is also both a narcotic and a hallucinogen. The district court did not address this issue in discussing the Farmers Policy, presumably because Farmers did not raise it in its motion to dismiss, other than to point out in a footnote that the complaint alleges that "Kratom can lead to hallucinations . . . and death[s] caused by a hallucinogen are excluded." R. at 163 n.5. The district court did, however, determine that Kratom is a narcotic for purposes of the narcotics exclusion in the WNIC Policy. We likewise address the parties' arguments about whether Kratom is a narcotic in the context of our discussion of the dismissal of the Johnsons' claims against WNIC. And because we conclude Kratom is a "drug" within the meaning of the drug exclusion in the Farmers Policies, we need not address whether it is also a narcotic and a hallucinogen for purposes of that exclusion and whether Farmers preserved those issues for appeal.

[7] *See, e.g.*, *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 507 (Colo. 2004) (consulting Black's and Merriam-Webster's in determining plain meaning of term in insurance policy); *Mook v. Bd. of Cnty. Comm'rs of Summit Cnty.*, 457 P.3d 568, 575

10

As pertinent here, Merriam-Webster defines "drug" to include "a substance used as a medication," "a substance intended for use in the . . . mitigation [or] treatment . . . of disease," or "something . . . that causes addiction, habituation . . ., or a marked change in consciousness," *Drug*, Merriam-Webster, https://www.merriam-webster.com/dictionary/drug?src=search-dict-box (last visited August 27, 2024). Similarly, Black's defines "drug" as "[a] substance intended for use in the . . . treatment . . . of disease," or "[a] natural or synthetic substance that alters one's perception or consciousness." *Drug*, Black's Law Dictionary (12th ed. 2024). And according to Oxford American, "drug" means "a medicine or other substance which has a physiological effect when ingested or otherwise introduced into the body" or "a substance taken for its narcotic or stimulant effects." *Drug*, New Oxford American Dictionary (3rd Ed. 2010).

The allegations in the complaint establish that Ms. Johnson used Kratom as a medication—she took it to treat chronic pain caused by gout. Relying on scientific literature, the complaint acknowledges that Kratom contains "psychoactive compounds" that "can lead to [the] release of pain[], euphoria and sedation," that it is addictive, and that its use can cause "many adverse health impacts," including "hallucinations [and] delusions." R. at 109. Among the scientific literature the complaint refers to are publications by the Drug Enforcement Administration (DEA) and Federal Drug Administration (FDA) that describe Kratom in terms that fit within

---

(Colo. 2020) (consulting Black's and Oxford American in determining plain meaning of undefined statutory term).

11

the dictionary definitions of "drug."  *See* R. at 109-10 & n.1, 3.  Specifically, the DEA's "Drug Fact Sheet" for Kratom states that it can have both stimulant and sedative effects and can lead to dependence and addiction, and it indicates that the DEA lists Kratom as a "Drug and Chemical of Concern." https://www.dea.gov/sites/default/files/2020-06/Kratom-2020_0.pdf  (last visited August 27, 2024).  The FDA literature states that Kratom "is often used to self-treat conditions such as pain."  https://www.fda.gov/news-events/public-health-focus/fda-and-kratom (last visited August 27, 2024).  These allegations and incorporated documents establish that Kratom falls squarely within the common definitions of the word "drug."

We acknowledge the Johnsons' assertion in the complaint that Kratom is an "herbal/dietary supplement."  R. at 110.  To the extent they contend that this precludes classification of Kratom as a "drug," we note  the terms "supplement" and "drug" are not mutually exclusive, since "herbal supplements" can also be "drugs." The statutory definition of the term "dietary supplement" in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(ff)(1), "contemplates that dietary supplements may fall under the [21 U.S.C.] § 321(g) definition of 'drugs.'"  *Whitaker v. Thompson*, 353 F.3d 947, 949 (D.C. Cir. 2004); *see also United States v. Ten Cartons, More or Less, of an Article Ener-B Vitamin B-12*, 72 F.3d 285, 287 (2d Cir. 1995) (analyzing statutory definitions of "drug" and "dietary supplement" and

recognizing that a "dietary supplement can be a drug").[8]  In any event, regardless of

whether Kratom is marketed as a supplement, the allegations in the complaint

establish that Ms. Johnson used it as a drug as that word is commonly defined and

understood.

Nevertheless, the Johnsons argue that "drug" is ambiguous as used in the

Farmers Policies.  Specifically, they argue that the phrase "unless as prescribed by a

physician" modifies the word "drug" in the exclusion, so a reasonable insured would

understand "drug" to mean only drugs that, unlike Kratom, are "capable of being

prescribed by a physician."  Aplt. Opening Br. at 25.  This is the type of strained

interpretation Colorado courts have rejected.

The Johnsons' proposed interpretation ignores that fact that the word "drug"

and the other words they contend are modified by the "unless" clause—medication,

narcotic, and hallucinogen—are preceded by the word "any."  R. at 42, 44.  The

Colorado Supreme Court has described a phrase preceded by the word "any" as

"highly inclusive."  *Allen v. Pacheco*, 71 P.3d 375, 379 (Colo. 2003); *see also*

*Mountain Stone Co. v. H. W. Hammond Co.*, 564 P.2d 958, 961 (Colo. App. 1977)

(describing the word "any" as one of "the most comprehensive words in the English

language" (internal quotation marks omitted)).  And that court refused to limit the

"broad sweep" of the undefined phrase "public mon[ie]s" in a statute prohibiting the

---

[8] We note, however, that according to the FDA, Kratom "is not appropriate for use as a dietary supplement."  https://www.fda.gov/news-events/public-health-focus/fda-and-kratom (last visited August 27, 2024).

use of such funds for particular purposes, because the phrase was followed by the "all-inclusive language 'from any source,'" which "indicates that the General Assembly intended an expansive definition of the phrase." *Denver Area Lab. Fed'n, AFL-CIO v. Buckley*, 924 P.2d 524, 527 (Colo. 1996) (internal quotation marks omitted)); *see also United Transp. Union v. Dole*, 797 F.2d 823, 826, 829 (10th Cir. 1986) (declining to limit "all-inclusive" scope of statute prohibiting "construction of *any* sleeping quarters" by common carriers, explaining, "[w]e will not presume restrictions where Congress provided otherwise," because the "[u]se of 'any' would otherwise be nugatory").  Moreover, if the phrase "any drug, medication, narcotic or hallucinogen" were limited to prescribable substances, it would not include illegal substances.  It would not make sense for the policy to provide coverage for death caused by taking street drugs and other illegal substances but exclude coverage for death caused by taking prescribable substances without a prescription.  That is not how a reasonable insured would interpret the exclusion.

The Johnsons' proposed interpretation of the drug exclusion attempts to create an ambiguity where there is none.  *See Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 293 (Colo. 2005) (holding that policy provisions "should not be tortured to create ambiguities" and that courts "have no warrant to stretch language, through strained construction, to find against the insurer" (internal quotation marks omitted)).  Giving the policy language its plain and ordinary meaning, the exclusion is unambiguous:  the "unless" clause is an exception to the exclusion for deaths caused by the "taking of any drug, medication, narcotic or hallucinogen," as those

14

words are commonly understood. *See, e.g.*, *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 931 (Colo. 1999) (recognizing that the "unless" clause in provision excluding coverage for cost of remediating "seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening" was an exception to the pollution exclusion). Thus, a reasonable insured would interpret that clause as limiting the scope of the exclusion, not as changing the ordinary meaning of the word "drug." *See Cummings v. Minnesota Life Ins. Co.*, 711 F. Supp. 2d 1287, 1294 (N.D. Okla. 2010) (finding the word "drugs" in policy exclusion for death that "results from or is caused directly or indirectly by . . . drugs" unambiguous based on dictionary definitions, and holding that exclusion barred coverage for death resulting from ingestion of both prescription and non-prescription legal drugs).

We thus conclude that Kratom is a drug within the meaning of the drug exclusion and that because it contributed to the cause of Ms. Johnson's death, Farmers properly denied coverage. Thus, the district court correctly dismissed the claims against Farmers on that basis. Having so concluded, we need not address the parties' arguments about whether her death fell within the sickness exclusion.

**C. The district court correctly dismissed the claims against WNIC.**

The district court held that Ms. Johnson's death was not covered under the WNIC Policy for two reasons: (1) it was a result of using Kratom, so fell within the narcotics exclusion, and (2) it was not an accidental injury under the Policy because it was the result of medical treatment—her prescribed use of hydrocodone to treat

15

gout.  The Johnsons challenge both bases for dismissal.  We agree with the district court's first ground for dismissal and do not address the second.

The narcotics exclusion in the WNIC Policy precluded coverage for death "contributed to, caused by, or resulting from" the insured's "[b]eing legally intoxicated, or so intoxicated that mental or physical abilities are seriously impaired. . ., or being under the influence of any narcotic, unless such narcotic is taken under the direction of and as directed by a Physician."  R. at 75.

Again, the Policy does not define "narcotic," so we turn to commonly accepted dictionary definitions to determine its meaning.  Merriam-Webster defines "narcotic" as "a drug (such as opium or morphine) that in moderate doses dulls the senses, [and] relieves pain," and "something that soothes, relieves, or lulls."  *Narcotic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/narcotic?src=search-dict-box (last visited August 14, 2024).  And Black's defines it as "[a]n addictive drug, esp. an opiate, that dulls the senses and induces sleep."  *Narcotic*, Black's Law Dictionary (12th ed. 2024).

The same allegations in the complaint that establish that Kratom is a drug also establish that it is a narcotic within these commonly understood definitions.  The Johnsons assert that "[t]he same arguments" they made in challenging the dismissal of the claims against Farmers "apply with equal force to the claims asserted against [WNIC]."  Aplt. Opening Br. at 29.  But their ambiguity argument regarding the "unless" clause in the WNIC Policy's narcotics exclusion fails for the same reasons it failed regarding the drug exclusion in the Farmers Policy.  A reasonable insured

16

would understand that the "unless" clause in the WNIC Policy is an exception to the exclusion, and would interpret the Policy as excluding coverage for death caused by the use of an unprescribed narcotic.

We thus conclude that Kratom is a narcotic within the meaning of the narcotics exclusion and that because it contributed to the cause of Ms. Johnson's death, WNIC's failure to pay benefits was proper and did not constitute a breach of the Policy. Accordingly, the district court correctly dismissed the claims against WNIC. And, having so concluded, we do not address whether the district court correctly concluded that her death was not an accidental injury under the Policy.

## IV.    <u>CONCLUSION</u>

The judgment is affirmed.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge

17