Mark SIMON, Cheryl Simon, and
Malachai Simon, Petitioners,

v.

The STATE COMPENSATION INSUR-
ANCE AUTHORITY, the State Compen-
sation Insurance Fund, and the Colora-
do Compensation Insurance Authority,
Respondents.

No. 95SC304.

Supreme Court of Colorado,
En Banc.

Oct. 20, 1997.

As Modified on Denial of Rehearing
Nov. 20, 1997.

Andrew T. Brake, P.C., Lee T. Judd, An-
thony J. Kohler, Denver, for Petitioners.

Gale A. Norton, Attorney General, Martha
Phillips Allbright, Chief Deputy Attorney
General, Richard A. Westfall, Solicitor Gen-
eral, Garth C. Lucero, Deputy Attorney Gen-

eral, Timothy R. Arnold, Deputy Attorney General, Gregg E. Kay, First Assistant Attorney General, Beverly Fulton, Assistant Attorney General, Civil Litigation Section, Tort Litigation, Vaughan, Reeves & DeMuro, David R. DeMuro, Special Assistant Attorney General, Denver, for Respondents.

Justice MULLARKEY delivered the Opinion of the Court.

The petitioners, Mark Simon (Simon), his wife, Cheryl Simon, and their son, Malachai Simon (collectively the Simons), challenge *Simon v. State Compensation Insurance Authority*, 903 P.2d 1139 (Colo.App.1994), where the court of appeals affirmed a judgment entered by the trial court dismissing state and federal claims asserted against respondents, the Colorado Compensation Insurance Authority (the CCIA), and its predecessors, the State Compensation Insurance Authority (the SCIA) and the State Compensation Insurance Fund (SCIF). We granted certiorari to review the court of appeals' determination that the Simons could not pursue a claim based on alleged violations of 42 U.S.C. § 1983 (1988) because the CCIA is not a person for purposes of that statute.[1] We reverse.

### I.

This action stems from Mark Simon's attempts to obtain workers' compensation benefits from the CCIA. In addition to other federal and state claims, the Simons alleged that the CCIA violated 42 U.S.C. § 1983 (1988) by wrongfully withholding benefits. For the purposes of our review, because the district court dismissed the action for failure to state a claim pursuant to C.R.C.P. 12(b), we take the allegations as stated in the Simons' complaint as true. *See Shapiro & Meinhold v. Zartman*, 823 P.2d 120, 122–23 (Colo.1992); *Destefano v. Grabrian*, 763 P.2d 275, 278 (Colo.1988).

According to the Simons' complaint, Mark Simon and his business partners obtained a workers' compensation insurance policy with the SCIF in 1982. In 1984, Simon became a sole proprietor. At that time, Simon notified the SCIF that he was the insured and continued to pay his insurance premiums from that date through January 1985.

On or about January 15, 1985, Simon sustained a pelvic injury during the course of his employment and filed a claim with the SCIF. At that time, the SCIF denied Simon's claim on the grounds that, as a sole proprietor, he was not covered under the terms of the policy. Simon successfully challenged the SCIF's decision before an administrative law judge (ALJ) and the Industrial Claims Appeals Panel (the Panel) affirmed. Both the ALJ and the Panel found that Simon's injuries were covered by the terms of the policy that was issued to Simon.

On July 1, 1987, the SCIF's responsibility for payments of claims pursuant to Simon's policy was assumed by the newly created SCIA. *See* §§ 8–54–102, –102.5, 3B C.R.S. (1986). Although it had been determined that Simon's injury was covered by the policy, the SCIA disputed Simon's entitlement to temporary disability benefits or medical benefits. Simon sought administrative relief from the SCIA's determination, and an ALJ concluded that Simon was entitled to benefits. On appeal, the ALJ's ruling was affirmed by the Panel. The SCIA subsequently filed a general admission of liability regarding Simon's temporary and total disability and obtained an offset because Simon had settled his third party tort claim.

On July 1, 1989, the SCIA's responsibilities were assumed by the newly created CCIA. *See* § 8–45–101, 3B C.R.S. (1990).

---

**1.** Although the court of appeals affirmed the district court's dismissal of numerous state and federal claims, our review in this case is limited solely to the propriety of the court of appeals' determination of § 1983 liability. The issue for which we granted certiorari was:

Whether the court of appeals erred in holding that the Colorado Compensation Insurance Authority (CCIA), is "an arm of the state" and thus not a "person" within the meaning of 42 U.S.C. § 1983 (1988), thereby precluding the petitioners' claim on that basis.

The CCIA failed to make any disability payments to Simon until September of 1992. In addition, during this period of time Simon became involved in the legislative process relating to workers' compensation laws in Colorado. According to Simon, as a result of his involvement in the legislative process, the CCIA released confidential and/or false information about him in an effort to discredit him.

The Simons filed the present action on April 13, 1993. The Simons' complaint contained state law claims of bad faith and breach of fiduciary duty, outrageous conduct, loss of consortium, interference with familial relations, and invasion of privacy. The complaint also alleged that the CCIA had violated state and federal law with respect to the publication of "false, confidential and/or private statements." Finally, the complaint alleged that the CCIA was liable for violations of 42 U.S.C. § 1983 (1988). According to the Simons, the CCIA's conduct violated their equal protection and due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

The CCIA filed a motion to dismiss the Simons' complaint on the grounds that the state law claims were barred by the Colorado Governmental Immunity Act (Immunity Act), sections 24–10–101 to –120, 10A C.R.S. (1988), and that the § 1983 claim was inapplicable because the CCIA was not a person for the purposes of that statute.[2] The district court agreed with the CCIA and dismissed the action.

On appeal, the court of appeals affirmed the district court's judgment. First, the court of appeals held that the state law claims were properly dismissed pursuant to the Immunity Act. The court of appeals also held, relying on *Austin v. State Industrial Insurance System*, 939 F.2d 676 (9th Cir. 1991), and *Wigger v. McKee*, 809 P.2d 999 (Colo.App.1990), that the CCIA was an arm of the state and not a person for the purposes of § 1983 liability. According to the court of appeals, whether a government entity is an "arm of the state" is determined "by

balancing the entity's independent powers with those entirely dependent on the state." *Simon*, 903 P.2d at 1145. As previously noted, we granted certiorari solely to review the court of appeals' conclusion as to the CCIA's status under 42 U.S.C. § 1983 (1988).

## II.

The State Compensation Insurance Fund (SCIF) was established by the General Assembly in 1915. The SCIF was developed to allow employers to secure compensation for injured employees or the dependents of injured employees by paying a premium into the SCIF. *See* ch. 179, sec. 20, 1915 Colo. Sess. Laws 515, 529. At the time of Simon's injury, the SCIF was a division of the State Department of Labor and Employment. *See* § 8–54–101(1), 3 C.R.S. (1973). The SCIF administered itself under the direction of a manager who was appointed by the director of the State Department of Labor and Employment. *See* §§ 8–54–102, –104(1), 3 C.R.S. (1973). The General Assembly also created an advisory council to assist the manager which consisted of the commissioner of insurance and twelve other members who were appointed by the governor. *See* § 8–54–103(1), 3 C.R.S. (1973). Of the twelve appointees, two were members of the General Assembly, eight were employers insured with the SCIF, and two were employees whose employers were insured with the SCIF. *See id.*

On July 1, 1987, the monies from the SCIF were transferred to the newly created SCIA Fund. *See* § 8–54–102(1), 3B C.R.S. (1986). The duties for administering SCIA Fund were transferred to the SCIA on January 1, 1987. *See* § 8–54–102.5(1), 3B C.R.S. (1986). Unlike the SCIF, the powers of the SCIA were vested in a board of five directors appointed by the governor with the consent of the senate. *See* § 8–54–102.5(2), 3B C.R.S. (1986). The board consisted of the executive director of the Department of Labor and Employment, three employers insured with the SCIA, and one other member who was either an employee whose employer was in-

---

2. As discussed in this opinion, in order for a defendant to be liable for a violation of 42 U.S.C. § 1983 (1988), the plaintiff must first establish that the defendant is a "person." *See Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980).

sured with the SCIA or a concerned citizen. *See id.* The board had the power to appoint a manager of the SCIF Fund, develop and approve an annual budget, establish general policies and procedures for the administration of the SCIF Fund, promulgate regulations, review and recommend legislation pertaining to workers' compensation, and fix the rates to be charged for compensation insurance. *See* §§ 8–54–102.5(5), –105, 3B C.R.S. (1986).

In 1990, the legislature created the Colorado Compensation Insurance Authority (CCIA) and Fund. Similar to the SCIA, the CCIA is administered by a board of directors appointed by the governor. *See* § 8–45–101(2)(a), 3B C.R.S. (1996 Supp.). However, the CCIA board consists of seven members, and the statute does not require the executive director of the Department of Labor and Employment to be a member. *See id.* Instead, that board position now must be filled by a person "experienced in the management and operation of insurance companies." *Id.*

The monies in the respective Funds of the CCIA and its predecessors have been used to pay "losses sustained or liabilities incurred under the contracts or policies of insurance" issued to employers. *See* ch. 179, sec. 22, 1915 Colo. Sess. Laws 515, 529–30; § 8–54–102(4), 3B C.R.S. (1986); § 8–45–102(4), 3B C.R.S. (1996 Supp.). Each entity has been required to fix the lowest possible rate consistent with a solvent fund and the creation and maintenance of a reasonable surplus. *See* ch. 179, sec. 28, 1915 Colo. Sess. Laws 515, 533; § 8–54–109, 3B C.R.S. (1986); § 8–45–106, 3B C.R.S. (1996 Supp.). In addition, the state treasurer has been the custodian of each Fund. *See* ch. 179, sec. 66, 1915 Colo. Sess. laws 515, 552; § 8–54–221, 3B C.R.S. (1986); § 8–45–118, 3B C.R.S. (1996 Supp.). However, with respect to the SCIA Fund and the CCIA Fund, the General Assembly included a provision that monies of the Fund were not to be transferred or revert to the state general fund at the end of the fiscal year. *See* § 8–54–102(5), 3B C.R.S. (1986); § 8–45–102(5), 3B C.R.S. (1996 Supp.). The General Assembly also has consistently provided that the state shall not be liable for payments chargeable to the Funds beyond the amount in the Funds. *See* ch. 179, sec. 20, 1915 Colo. Sess. Laws 515, 529; § 8–54–102(1), 3B C.R.S. (1986); § 8–45–102(1), 3B C.R.S. (1996 Supp.)

The SCIA and CCIA differ from the original SCIF in two important respects. First, unlike the SCIF employees, the CCIA and SCIA employees are exempted from the state personnel system. *See* § 8–54–102.5(9), 3B C.R.S. (1986); § 8–45–101(9), (10), 3B C.R.S. (1996 Supp.). Second, the enabling statutes for both the SCIA and CCIA categorized those entities as corporate bodies and political subdivisions of the state and expressly provided that the entities were *not* state agencies. *See* § 8–54–102.5(1), 3B C.R.S. (1986); § 8–45–101(1), 3B C.R.S. (1996 Supp.).

Having reviewed the history of the CCIA and the Fund that it administers, we now turn to the question whether the CCIA is a "person" under § 1983.

### III.

Section 1 of the Civil Rights Act of 1871, now codified as 42 U.S.C. § 1983 (1988), provides in relevant part:

> Every *person* who, under color of state statute, ordinance, regulation, custom, or usage, of any state or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

(Emphasis added.) As noted above, the court of appeals in this case affirmed the district court's dismissal of the Simons' § 1983 claims because it concluded that the CCIA was an "arm of the state" and not a "person" under 42 U.S.C. § 1983 (1988). Before addressing the merits of the court of appeals' conclusion, we will first identify the proper framework for § 1983 analysis.

The leading United States Supreme Court case examining the delicate question of whether a state-created entity is a "person"

under § 1983 is *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Prior to *Will,* the bulk of the Supreme Court's discussion of this issue was limited to the status of local government boards and/or municipalities. For example, in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court overruled long-standing precedent and held that local governing bodies such as municipalities were persons under § 1983. *See Monell,* 436 U.S. at 701, 98 S.Ct. at 2041. Subsequently, in *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), the Supreme Court briefly touched on the broader issue of the status of state-created entities in § 1983 cases when it stated that Congress did not intend to abrogate state Eleventh Amendment immunity in § 1983 suits. *See Quern,* 440 U.S. at 341–45, 99 S.Ct. at 1145–47. However, because the action in *Quern* was filed in federal court, the Supreme Court's discussion was limited to the applicability of Eleventh Amendment immunity and did not specifically address whether a state was a "person" under § 1983.[3]

Unlike *Quern,* the plaintiff in *Will* filed his § 1983 action in state court. Because Eleventh Amendment immunity does not apply in state courts, the question of whether a state was a person under § 1983 was squarely before the Supreme Court for the first time. *See Will,* 491 U.S. at 63–64, 109 S.Ct. at

2308–09. Based in large part on the fact that the Eleventh Amendment provides states with immunity in federal court, the Court held that a state is not a "person" under 42 U.S.C. § 1983. *See id.* at 66, 109 S.Ct. at 2309. The Court also concluded that, as "arms of the State," the Michigan Department of State Police and its director likewise could not be sued in state court under § 1983. *See id.* at 70–71, 109 S.Ct. at 2312.

■ The Eleventh Amendment provides in relevant part that:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by Citizens or Subjects of any Foreign State.

While the terms of the Eleventh Amendment only establish a limitation on the jurisdiction of federal courts, the Supreme Court reasoned that it would be inconsistent to treat a state-created entity as an "arm of the State" for the purposes of Eleventh Amendment immunity in federal court proceedings while treating the same entity as a "person" for the purposes of § 1983 claims in state court proceedings. Thus, under *Will,* an Eleventh Amendment arm-of-the-state analysis must be applied to determine whether a state-created entity is a "person" under § 1983.[4] Therefore, in order to determine whether the CCIA and its predecessors are "persons"

---

**3.** In *Uberoi v. University of Colorado*, 713 P.2d 894 (Colo.1986), a pre-*Will* decision, we held that the University of Colorado was a "person" under § 1983. In its *Will* decision, the Supreme Court stated that it granted certiorari to resolve a conflict among the courts on the question of whether a state is a person under § 1983 and cited *Uberoi* as one of the cases holding that the state is a person. *See Will,* 491 U.S. at 61 n. 3, 109 S.Ct. at 2307 n. 3. *Will* mischaracterized the holding in *Uberoi* because *Uberoi* addressed only the § 1983 status of the university, not the § 1983 status of the state. We leave it for another day to decide whether *Will* overruled *Uberoi*'s holding that the University of Colorado was a person for the purposes of § 1983. We also held in *Uberoi* that the Eleventh Amendment was inapplicable to § 1983 claims in state court. While this is technically correct, *see Maine v. Thiboutot*, 448 U.S. 1, 9 n. 7, 100 S.Ct. 2502, 2507, 65 L.Ed.2d 555 (1980), subsequent Supreme Court opinions discussed *infra* at 1302–

1303 have established that an Eleventh Amendment arm-of-the-state analysis must be employed in a state court case when determining whether a state-created entity is a "person" under § 1983.

**4.** One year after *Will* was decided, in *Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990), the Supreme Court reasserted the appropriateness of Eleventh Amendment analysis when determining whether an entity is a "person" under section 1983. The court stated:

> As we held last term in *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), an entity with Eleventh Amendment immunity is not a "person" within the meaning of § 1983.... *Will* establishes that the State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court. *Howlett,* 496 U.S. at 365, 110 S.Ct. at 2437.

that can be sued under 42 U.S.C. § 1983 (1988), we must decide whether the CCIA is an arm of the state under Eleventh Amendment analysis.[5]

Because the *Will* decision did not fully explain the proper scope of the arm-of-the-state analysis, lower federal and state courts have relied on numerous factors articulated in two earlier Supreme Court decisions to determine whether a particular state-created entity is an arm of the state. The first of these two cases, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), concerned the status of a local school board. In concluding that a local school board was not an arm of the state under the Eleventh Amendment, the Supreme Court considered: (1) how local school districts were characterized under state law; (2) whether the school board was subject to the guidance of the state; (3) whether the school board received significant funding from the state; and (4) whether the school board had the power to raise its own funds. *See id.* at 280, 97 S.Ct. at 572. Without placing particular emphasis on any one of these factors, the Supreme Court held that "[o]n balance," the local school board was "more like a county or city than it [was] like an arm of the State." *Id.*

The second major Supreme Court case addressing the factors to be considered in the arm-of-the-state analysis was *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). In *Lake Country Estates* the Supreme Court considered the Eleventh Amendment immunity status of the Tahoe Regional Planning Agency (Tahoe Agency). The Tahoe Agency was created by an interstate compact between California and Nevada to coordinate and regulate land de-velopment in the Lake Tahoe area. *See* 440 U.S. at 394, 99 S.Ct. at 1173. In reaching its conclusion that the Tahoe Agency was not an arm of the state, the Court relied on the following factors: (1) that the Tahoe agency was designated in the interstate compact as a "separate legal entity" and a political subdivision; (2) that the majority of the Tahoe Agency governing members were appointed by counties and not by the states; (3) that the agency was exclusively funded by the counties; (4) that the compact expressly stated that the Tahoe Agency's obligations were not binding on the states; (5) that the regulation of land use was of local, rather than state-wide, concern; and (6) that the states did not have veto power over rules and regulations promulgated by the agency. *See id.* at 401–02, 99 S.Ct. at 1177–78. As in *Mt. Healthy*, the Supreme Court did not identify any one factor as dispositive.

These two Supreme Court decisions clearly indicate that the question of whether a particular entity is an arm of the state is to be determined by balancing various factors. However, because the Court referred to different factors in *Mt. Healthy* and in *Lake Country Estates*, and because the Court did not specify the relative importance of any particular factor, lower federal courts have developed a diverse array of balancing tests.[6] For example, the Fifth Circuit Court of Appeals has identified six factors:

> (1) whether the state statutes and case law characterize the agency as an arm of the state; (2) the source of the funds for the agency; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued

---

5. Many other state courts have reached the same conclusion that an Eleventh Amendment arm-of-the-state analysis must be utilized when determining whether a state-created entity is a person under § 1983. *See, e.g., Town of Lake Clarke Shores v. Page*, 569 So.2d 1256, 1257 (Fla.1990); *Board of Trustees v. Landry*, 638 N.E.2d 1261, 1264 (Ind.Ct.App.1994); *Livingood v. Meece*, 477 N.W.2d 183, 190–91 n. 5 (N.D.1991); *Williams v. State*, 156 Vt. 42, 589 A.2d 840, 844 (1990). *But see Daddow v. Carlsbad Mun. Sch. Dist.*, 120 N.M. 97, 898 P.2d 1235, 1239 (1995) (suggesting

that § 1983 analysis is different from Eleventh Amendment arm-of-the-state analysis), *cert. denied,* —— U.S. ——, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996).

6. For a survey of the tests adopted by various lower federal courts, *see* Alex E. Rogers, Note, *Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm–of–the–State Doctrine*, 92 Colum.L.Rev. 1243, 1269–71 (1992).

in its own name; (6) whether the entity has the right to hold and use property. *Delahoussaye v. New Iberia,* 937 F.2d 144, 147 (5th Cir.1991). In contrast, the Third Circuit Court of Appeals has articulated a three-prong test with numerous sub-factors:

(1) whether, in the event the plaintiff prevails, the payment of the judgment would come from the state (this includes three considerations: whether payment will come from the state treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) the status of the agency under state law (this includes four factors: how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue and be sued in its own right, and whether it is immune from state taxation); and

(3) what degree of autonomy the agency has.

*Peters v. Delaware River Port Auth.,* 16 F.3d 1346, 1350 (3d Cir.1994).

The Tenth Circuit Court of Appeals has applied different factors in different cases. Recently, in *Watson v. University of Utah Medical Center,* 75 F.3d 569, 574–75 (10th Cir.1996), the Tenth Circuit examined the University of Utah Medical Center's degree of autonomy, the extent of financing it received independent of the state treasury, and its ability to provide for its own financing before concluding that it was an arm of the state under the Eleventh Amendment. However, in two earlier cases, *Mascheroni v. Board of Regents of the University of California,* 28 F.3d 1554 (10th Cir.1994) and *Ambus v. Granite Board of Education,* 995 F.2d 992 (10th Cir.1993), the Tenth Circuit specifically relied on all four *Mt. Healthy* factors.

See *Mascheroni,* 28 F.3d at 1559; *Ambus,* 995 F.2d at 994.

Our court of appeals addressed the post-*Will* arm-of-the-state analysis in *Wigger v. McKee,* 809 P.2d 999 (Colo.App.1991).[7] In *Wigger,* the plaintiff brought a § 1983 action against a county, a county board of commissioners, a county sheriff's department, a county department of social services, and experts in their official and individual capacities, based on an alleged wrongful prosecution of the plaintiff for sexually assaulting young girls. See *Wigger,* 809 P.2d at 1001. The *Wigger* court concluded that the county, the board of commissioners, and the sheriff's department were all "persons" under § 1983 while the state and county departments of social services were arms of the state. See *id.* at 1003–04. In reaching its conclusion, the court of appeals balanced each entity's independent powers with those entirely dependent on the state. See *id.* at 1003. According to the court of appeals, "[i]f the entity is the state's alter ego, dependent entirely on the state for the funds and resources to respond to a suit for damages, it is equivalent to the state." *Id.*

In the present case, the court of appeals heavily relied on the reasoning of *Wigger* in concluding that the CCIA is an arm of the state. However, as we noted in *City of Lakewood v. Brace,* 919 P.2d 231 (Colo.1996), the defenses to § 1983 actions are defined by federal law and we need not consider here whether *Wigger* was properly decided. See *Brace,* 919 P.2d at 238; *see also Howlett v. Rose,* 496 U.S. 356, 375–76, 110 S.Ct. 2430, 2442–43, 110 L.Ed.2d 332 (1990) (stating that "[t]he elements of, and defenses to, a federal cause of action are defined by federal law."). Therefore, we draw our analysis primarily from federal caselaw.

---

7. *Wigger* is one of a number of court of appeals' decisions which have considered whether a state-created entity is a "person" under § 1983. *See Bannister v. Colorado Supreme Court Disciplinary Counsel,* 856 P.2d 79, 81 (Colo.App.1993) (Disciplinary counsel is not a "person" under § 1983; *National Camera, Inc. v. Sanchez,* 832 P.2d 960, 963–64 (Colo.App.1991) (State Board for Community Colleges and Occupational Education is not a "person" under § 1983); *Stjernholm v. Colorado State Bd. of Chiropractic Exam'rs,* 820 P.2d 1166, 1167 (Colo.App.1991) (Board of Chiropractic Examiners is not a "person" under § 1983); *Weaver v. Colorado Dep't of Soc. Servs.,* 791 P.2d 1230, 1235 (Colo.App.1990) (Department of Social Services is not a "person" under § 1983).

## IV.

■ Our review of federal caselaw shows three dominant factors upon which federal courts consistently rely to determine whether a state-created entity is an arm of the state for the purposes of Eleventh Amendment immunity in federal courts. These factors are: (1) how state law characterizes the entity, (2) whether the entity is autonomous and free from the control of the state, and (3) whether the judgment against the entity would ultimately be paid by the state. Guided by the federal caselaw and the Supreme Court's reasoning in *Will*, we now find that these same factors are appropriate when determining whether a state-created entity is a "person" that can be sued under 42 U.S.C. § 1983 (1988). Moreover, consistent with *Mt. Healthy* and *Lake Country Estates*, we hold that these factors are part of a balancing test and that it is therefore necessary to consider all three factors before reaching a conclusion as to the entity's immunity status. We address each of these factors in turn.

### A.

While the ultimate determination of whether an entity is an arm of the state under the Eleventh Amendment is a question of federal law, *see Howlett*, 496 U.S. at 375–76, 110 S.Ct. at 2442–43; *Brace*, 919 P.2d at 238, the first factor to be considered in making that determination is how the entity is characterized by state law. Although some lower federal courts have concluded that this factor is often decisive or controlling,[8] the Supreme Court has simply indicated that it is one of the factors that should be considered as part of an arm-of-the-state analysis. *See Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. at 44–45, 115 S.Ct. at 402–03; *Lake Country Estates*, 440 U.S. at 401–02, 99 S.Ct. at 1177–78; *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572. Legislative declarations of purpose and judicial decisions regarding the entity's characteristics and powers are relevant to this inquiry.

When assessing the nature of an entity under state law, courts often look first to the statutory language creating the entity. For example, in *Mt. Healthy* the Supreme Court relied on the fact that Ohio state law designated local school boards as political subdivisions in reaching its conclusion that the Mt. Healthy school board was not an arm of the state. *See Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572. Similarly, in *Lake Country Estates* the Court was persuaded by the fact that the interstate compact creating the Tahoe Agency designated the agency as a "separate legal entity" and a political subdivision. *See Lake Country Estates*, 440 U.S. at 401, 99 S.Ct. at 1177. In both cases, the Supreme Court essentially concluded that the entities were not arms of the state because the enabling statutes failed to articulate a clear intention to cloak the entities with Eleventh Amendment immunity.

### B.

The second factor to be considered when determining whether an entity is an arm of the state is the level of autonomy and independence the entity enjoys from the control of the state. The greater the state administrative and financial influence on the entity, the more likely it is that the entity will be treated as an arm of the state. For example, in *Lake Country Estates* the Supreme Court noted that the majority of the Tahoe Agency's board members were appointed by local counties and cities collectively and not by the two states. *See Lake Country Estates*, 440 U.S. at 402, 99 S.Ct. at 1177. Some lower federal courts have also considered other indications of state administrative control such as: (1) the authority of the state to veto regulations promulgated by the entity, *see Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1087–88 (8th Cir.1991); (2) whether the entity must seek state approval with respect to entity policies or activities, *see Ambus*, 995 F.2d at 995–96; and (3) whether the entity must file reports to the state or submit to audits, *see Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1149 (3d Cir.1995).

---

**8.** *See Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., Inc.*, 625 F.2d 22, 25 (5th Cir. 1980)(state law "subsumes" all other factors); *Korgich v. Regents of the New Mexico Sch. of Mines*, 582 F.2d 549, 551 (10th Cir.1978)(state law is "decisive").

Another important measure of entity autonomy is whether the state exerts any financial influence over the entity. The degree to which an entity receives all or most of its funding from the state was listed as a factor in both *Mt. Healthy* and *Lake Country Estates*. In *Mt. Healthy*, the fact that local school boards had the ability to generate their own funds through the issuance of bonds or levying taxes was significant to the Court's conclusion that the boards were more like a county or city than an arm of the state. *See Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572. Similarly, in *Lake Country Estates* the Supreme Court was partly persuaded by the fact that the Tahoe Agency was funded exclusively by counties in reaching its conclusion that the agency was not an arm of the state. *See Lake Country Estates*, 440 U.S. at 401–02, 99 S.Ct. at 1177–78.

### C.

The third factor to be considered as part of an arm-of-the-state analysis is whether the judgment will ultimately be paid by the state. Support for consideration of this factor originated in two cases that did not involve arm-of-the-state inquiries. In *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945), the Supreme Court determined that in actions for retrospective relief against state officials the state is the real party in interest and may invoke its Eleventh Amendment immunity because the state will ultimately pay any judgment entered against the official. *See Edelman*, 415 U.S. at 663, 94 S.Ct. at 1355; *Ford Motor Co.*, 323 U.S. at 464, 65 S.Ct. at 350.

In *Mt. Healthy*, the Supreme Court applied a similar rationale when it considered

whether the entity received significant funding from the state or had the power to raise its own revenue as a factor in determining whether the entity was an arm of the state. *See Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572. In *Lake Country Estates*, the Court took this factor one step further when it considered whether the obligations of the entity at issue were binding on the states involved. *See Lake Country Estates*, 440 U.S. at 402, 99 S.Ct. at 1177.

While lower federal courts have consistently applied this factor when making arm-of-the-state determinations, the opinions do not agree as to the level of impact that must be shown for this factor to attain significance. *See Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 575–76 (10th Cir.1996) (judgment "might be satisfied, at least indirectly" from state treasury); *Austin v. State Indus. Ins. Sys.*, 939 F.2d 676, 679 (9th Cir.1991) (judgment "could" impact state treasury); *Travelers Indem. Co. v. School Bd.*, 666 F.2d 505, 509 (11th Cir.1982) (judgment "must under all circumstances" be satisfied out of state treasury). Nevertheless, these cases support our conclusion that whether a judgment will impact the state treasury is an important consideration in an arm-of-the-state analysis.

The CCIA argues that the state treasury criterion is the most important factor and should be held dispositive in this case.[9] We disagree.

Supreme Court precedent leads us to conclude that the judgment liability factor alone does not resolve whether an entity is entitled to Eleventh Amendment immunity. While the Supreme Court has acknowledged that the state treasury criterion is an important factor that should be considered, it has not

---

**9.** The CCIA correctly points out that some federal courts have suggested that the state treasury criterion is the most important factor. *See Watson v. University of Utah Med. Ctr.*, 75 F.3d 569 (10th Cir.1996) (holding that "the governmental entity is immune from suit if the money judgment sought is to be satisfied out of the state treasury."); *Hutsell v. Sayre*, 5 F.3d 996, 999 (6th Cir.1993) ("The most important factor ... is whether any monetary judgment would be paid out of the state treasury."), *cert. denied*, 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994);

*Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 818 (3d Cir.1991) ("[T]he 'most important' factor is 'whether any judgment would be paid from the state treasury.'") (quoting *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3rd Cir.1989)). However, as discussed earlier, other lower federal courts have suggested that different factors are equally, if not more, important. *See Huber*, 625 F.2d at 25 (state law "subsumes" all other factors); *Korgich*, 582 F.2d at 551 (state law is "decisive").

indicated that, standing alone, it outweighs all other factors. For example, in *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 48, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994), the Supreme Court considered factors other than state funding before concluding that the Port Authority Trans–Hudson Corporation was not an arm of the state. *Hess,* 513 U.S. at 45–49, 115 S.Ct. at 403–05. Contrary to the CCIA's argument here, the Court's pronouncement in *Hess,* regarding the importance of the state treasury criterion, was limited to an acknowledgment that some lower federal appellate courts have "recognized the vulnerability of the State's purse as the most salient factor." *Id.* In a subsequent case, *Seminole Tribe of Florida v. Florida,* 517 U.S. 609, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court expressly stated, "The Eleventh Amendment does not exist solely in order to 'preven[t] federal court judgments that must be paid out of a State's treasury'...." *Seminole,* 517 U.S. at ——, 116 S.Ct. at 1124 (quoting *Hess,* 513 U.S. at 48, 115 S.Ct. at 404).

Even more recently, in *Regents of the University of California v. Doe,* —— U.S. ——, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), the Supreme Court referred to a multifactor analysis when it addressed the Eleventh Amendment status of a state university in a contract action. In its general discussion of the arm-of-the-state analysis, the *Doe* Court stated that it sometimes considered "the essential nature and effect of the proceeding" and "the nature of the entity created by state law" when determining whether an entity should be granted Eleventh Amendment immunity. *Id.* The *Doe* Court also stated that "the question whether a money judgment against a state instrumentality or official would be enforceable against the state is of considerable importance to any evaluation of the relationship between the State and the entity ... being sued." *Id.* at ——, 117 S.Ct. at 904. However, the only issue in dispute in *Doe* was whether the state university was divested of Eleventh Amendment immunity for a breach of contract action when the federal government had agreed to indemnify it against litigation costs. *See Doe,* —— U.S. at ——, 117 S.Ct. at 901. As to this narrow issue, the *Doe* Court held that

"it is the entity's legal liability, rather than its ability or inability to require a third party to reimburse it, ... that is relevant." *Id.* at ——, 117 S.Ct. at 904. Thus, the *Doe* Court did not address whether the state treasury criterion was the dispositive or most important factor in an arm-of-the-state analysis.

In both *Hess* and *Doe,* the Supreme Court had an opportunity to reject the balancing tests articulated in *Lake Country Estates* and *Mt. Healthy* and instruct us that the funding factor alone was dispositive. Because the Supreme Court did not take that step, the balancing test remains in effect. We therefore reject the CCIA's argument and hold that the mere fact that the judgment would or could be paid by the state does not require the conclusion that the CCIA is an arm of the state. All three factors must be considered and weighed before reaching a conclusion as to the status of the CCIA.

V.

As an alternative argument, the CCIA contends that the application of the balancing test requires us to reach the same conclusion that was reached in *Austin v. State Industrial Insurance System,* 939 F.2d 676 (9th Cir. 1991), and *Lipofsky v. Steingut,* 86 F.3d 15 (2d Cir.1996). Both cases involved workers' compensation insurance and in both cases the courts found the entity in question to be an arm of the state. In *Austin,* the Ninth Circuit Court of Appeals held that the Nevada State Industrial Insurance System (Nevada SIIS) was entitled to Eleventh Amendment immunity. More recently, the Second Circuit Court of Appeals held in *Lipofsky* that the New York State Insurance Fund (New York SIF) was an arm of the state under the Eleventh Amendment.

Like the CCIA, both the Nevada SIIS and the New York SIF are state-created entities that provide workers' compensation insurance. Also, in reaching their respective conclusions that these entities were arms of the state, both the *Austin* court and the *Lipofsky* court applied multifactor balancing tests similar to the one we apply here. However, important differences exist between the

CCIA and those entities, both in how the entities are structured and how they are treated under state law. For example, in *Austin* the court emphasized the fact that a decision of the Nevada Supreme Court had found the Nevada SIIS to be a state agency. *See Austin,* 939 F.2d at 678. In addition, the Nevada Revised Statutes consistently treat the Nevada SIIS as an arm of the state or a state agency. *See id.* No comparable declaration of state law exists here. In fact, the enabling statute creating the CCIA expressly provides that the CCIA is *not* a state agency.

The entity in *Lipofsky* is also different from the CCIA. First, unlike the CCIA Fund, the New York Finance Commissioner is authorized to transfer excess New York SIF monies to other accounts within the state treasury. In reaching its conclusion that the New York SIF was an arm of the state, the *Lipofsky* court was partly persuaded by the fact that SIF funds were both controlled by the state and often commingled with other state funds. In addition, under New York law the state has an ultimate responsibility to satisfy any liability against the New York SIF. *See Lipofsky,* 86 F.3d at 17. "SIF is 'a State agency for all of whose liabilities the state is responsible.'" *Id.* (quoting *Methodist Hosp. of Brooklyn v. State Ins. Fund,* 64 N.Y.2d 365, 486 N.Y.S.2d 905, 909, 476 N.E.2d 304, 308 (1985)). In contrast, Colorado law specifically provides that liability against the CCIA is limited to the amount of the Fund. *See* § 8–45–102(1), 3B C.R.S. (1996 Supp.).

▇ Because the entities at issue in *Lipofsky* and *Austin* are distinguishable from the CCIA, we decline to follow those cases and instead turn to an application of our balancing test to the facts before us. As to the first factor, we agree with the Simons that Colorado law does not treat the CCIA as an arm of the state. The statute creating the CCIA states in relevant part:

> There is hereby created the Colorado compensation insurance authority which shall be a *body corporate and a political subdivision of the state. The authority shall not be an agency of the state government,* nor shall it be subject to administrative direction by any state agency except as

provided in this article, and except for the purposes of the "Colorado Governmental Immunity Act", article 10 of title 24, C.R.S., and except for inclusion in the risk management fund and by the division of risk management as provided in part 15 of article 30 of title 24, C.R.S.

§ 8–45–101(1), 3B C.R.S. (1990 Supp.)(emphasis added). On its face, then, the express language of the statute establishes that the Authority is not a state agency. In fact, the statute characterizes the CCIA as a "body corporate" and a "political subdivision of the state." These are well established terms that denote entities such as counties and municipalities that are not arms of the state. *See City of Durango v. Durango Transp., Inc.,* 807 P.2d 1152, 1156 (Colo.1991). As the Supreme Court concluded in *Mt. Healthy* and *Lake Country Estates,* we find that the enabling statute in this case suggests the CCIA should not be treated as an arm of the state.

Our recent decision in *Denver Area Labor Federation, AFL–CIO v. Buckley,* 924 P.2d 524 (Colo.1996), does not require a contrary result. In *Buckley,* we found that CCIA funds constituted "public monies" under section 1–45–116(1)(a), 1B C.R.S. (1980 & 1994 Supp.) of the Campaign Reform Act. The Campaign Reform Act precludes any "agency, department, board, division, bureau, commission, or council of the state or any political subdivision thereof" from expending "public monies from any source ... to urge electors to vote in favor of or against any issue before the electorate." § 1–45–116(1)(a), 3B C.R.S. (1994 Supp.). Because the CCIA enabling statute quoted above designates the CCIA as a political subdivision of the state and the term "public monies" was so broadly inclusive, we held in *Buckley* that the CCIA was prohibited from contributing money from the fund to promote or oppose an amendment to the Colorado Constitution. We did not expressly or by necessary implication hold in *Buckley* that the CCIA was an arm of the state.

As to the second factor, we find that the CCIA is sufficiently autonomous from the state, both administratively and financially, to be considered a "person" under § 1983.

Both in form and in substance, the legislature has declared that the CCIA is not a state agency. As noted above, the CCIA is defined in its enabling statute as a "body corporate and political subdivision of the state." § 8–45–101(1), 3B C.R.S. (1990 Supp.). The CCIA has the power to sue and be sued and to enter into contracts. *See* § 8–45–103(2), 3B C.R.S. (1990 Supp.). The revenue collected by the CCIA is derived from premiums and not from state-imposed sales, use, property or income taxes. Also, the amount of liability that the CCIA can incur is statutorily limited to the extent of assets of the Fund derived from premium payments. *See* § 8–45–102(1), (4), 3B C.R.S. (1990 Supp.). The CCIA's autonomy from the state is emphasized by the fact that its employees are exempted from the state personnel system. *See* § 8–45–101(9), (10), 3B C.R.S. (1996 Supp.); *cf.* Colo. Const. art. XII, § 13(2) (providing that, with certain exceptions not including the CCIA, "[t]he personnel system of the state shall comprise all appointive public officers and employees of the state."). These factors indicate that the legislature intended the CCIA to be self-sufficient and independent of the state itself.

Section 8–45–103(2) states:

[T]he manager shall manage and conduct all business and affairs . . . in the name of the [CCIA], and in that name, . . . the manager may:

(a)(I) Sue and be sued in all the courts of this state . . . in actions arising out of any act, deed, matter, or thing made, omitted, entered into, done, or suffered in connection with the [CCIA] fund and the administration, management, or conduct of the business or affairs relating thereto. . . .

(II) Nothing in this paragraph (a) shall be construed to waive any provisions of the "Colorado Governmental Immunity Act" . . . nor shall it be construed to waive immunity of the state of Colorado from suit in federal court, guaranteed by the eleventh amendment to the constitution of the United States.

§ 8–45–103(2), 3 C.R.S. (1997). On its face, subsection 103(2)(a)(II) is limited to subsection 103(2)(a) and does nothing more than declare that the state of Colorado does not waive its own immunity from suit by authorizing the CCIA to sue and to be sued. It does not equate the CCIA with the state itself. *See id.* Further, we note that when the legislature expressly included the CCIA in the Governmental Immunity Act, it made no reference to the state's Eleventh Amendment immunity. *See* § 8–45–101(1), 3 C.R.S. (1997).

 To the extent that there is any ambiguity in the enabling act, its legislative history supports our conclusion that the legislature intended to create the equivalent of a private insurance company.[10] The major structural change occurred when the state fund, the SCIF, was abolished and the state authority, the SCIA, was created in 1987. The legislature cut the financial ties that bound the fund to the legislature by exempting the authority from the legislative budget process so that the authority could operate with more flexibility as a private entity. Senator Steven J. Durham, the Senate sponsor of the bill to create the authority, stated, "[I]n terms of management, we are going to treat this like an insurance company. . . . The new entity is not under the legislative budget process. . . . [T]he managers of this operation have the flexibility that any board of directors would have. . . ." *Debate on S.B. 22 Before the Senate,* 55th General Assembly, 2d Reg. Sess. (Hearing Tape 86–14, Feb. 27, 1986, at 10:15 a.m.). Additionally, John Berry, representative of the SCIA, testified in 1990 that the SCIA wanted to change its name in order to gain even further autonomy from the state. He stated, "[W]e're looking to further separate ourselves from the state agency and that's why we ask to have the term 'State' stricken from our name and just [change it to] 'Colorado Compensation Insur-

---

**10.** In interpreting a statute, courts must give effect to intent giving rise to the legislation. *See Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049 (Colo.1995). In determining that intent, we look first to the plain meaning of the statutory language. If that language is ambiguous, we may consider, among other aids: (a) the circumstances under which the statute was enacted; (b) the legislative history; and (c) the consequences of a particular construction. *See People v. McNeese,* 892 P.2d 304 (Colo.1995); § 2–4–203, 1 C.R.S. (1997).

ance Authority'...." *Hearing on H.B. 1160 Before the House Committee on Agriculture, Livestock, and Natural Resources,* 57th General Assembly, 2d Reg. Sess. (Hearing Tape 90–3, Jan. 17, 1990, at 2:17 p.m.).

Further, the applicability of the Immunity Act to the CCIA cannot be dispositive with respect to whether the CCIA is an arm of the state or a person for § 1983 actions because the protections of the Immunity Act are not limited to arms of the state. For example, the Immunity Act protects cities and municipalities, as well as state agencies.[11] For § 1983 purposes cities and municipalities are persons, not arms of the state. *See Monell,* 436 U.S. at 690, 98 S.Ct. at 2035; *County of Adams v. Hibbard,* 918 P.2d 212, 216 (Colo.1996). By including the CCIA in the Immunity Act, the legislature did no more than treat the CCIA like a city, which under *Monell* is a person subject to suit under § 1983.

Based on its enabling act, we conclude that the legislature intended the CCIA to operate as much like a private insurance company as possible. Employers pay premiums to the Fund, the CCIA receives and processes claims, and then makes disbursements to claimants out of the Fund. *See* §§ 8–45–115 to –118, 3B C.R.S. (1990 Supp.). The CCIA clearly was structured so that it would be more responsive and efficient than a state agency which is subject to all of the constitutional and statutory constraints placed on the state. We therefore find that the legislature's expressed intent to grant the CCIA autonomy and to insulate the state from fiscal responsibility for the CCIA's conduct strongly supports the conclusion that, under the second factor, the CCIA should be treated as a "person" for § 1983 purposes.

CCIA's best argument is based on the third factor. As noted above, the enabling statute creating the CCIA states that it is not a state agency and is not subject to the control of any other state agency, "except for the purposes of the 'Colorado Governmental Immunity Act' . . . and except for inclusion in

the risk management fund and by the division of risk management...." § 8–45–101(1), 3B C.R.S. (1990 Supp.). The monies in the risk management fund are appropriated by the General Assembly to pay judgments entered against state agencies, *see* § 24–30–1510(3)(a), 10A C.R.S. (1988), and are held by the state treasurer. *See* § 24–30–1511, 10A C.R.S. (1996 Supp). Although the CCIA's enabling act states that it is not a state agency, section 24–30–1502(5), 10A C.R.S. (1996 Supp.) expressly defines CCIA as a "state agency" under the statute governing the Division of Risk Management. Therefore, we agree with the CCIA that a judgment in a § 1983 case might be paid out of the state treasury.

We are unable, however, to draw a definite conclusion that the state treasury automatically would pay a § 1983 liability award against the CCIA because it appears that the risk management fund is not the sole source for payment of a judgment against CCIA. The CCIA collects its own revenue from premiums paid by insureds and not from state-imposed sales, use, property or income taxes. *See* § 8–45–102, 3B C.R.S. (1996 Supp.). The monies in the CCIA Fund are meant to pay "losses sustained or liabilities incurred under the contracts or policies of insurance." *See* § 8–45–102(4), 3B C.R.S. (1996 Supp.). Any potential money judgment in this case may be considered a liability incurred under Simon's contract of insurance with CCIA. Moreover, the CCIA's enabling statute provides that the state shall not be liable for payments chargeable to the CCIA beyond the amount in the Fund. *See* § 8–45–102(1), 3B C.R.S. (1996 Supp.). Thus, the legislature apparently intended to shield the state from the liabilities of the CCIA. This tension or ambiguity between the CCIA's enabling statute and the provisions of the risk management fund statute leads us to conclude that the third factor lends only limited support to the CCIA's position because the state treasury is not

---

**11.** The Colorado Governmental Immunity Act extends its protections to the state and its political subdivisions including "public entities." The statutory definition of public entity includes "the state, county, city and county, incorporated city

or town, school district, special improvement district, and every other kind of district, agency, instrumentality or political subdivision of the state organized pursuant to law." § 24–10–103(5), 10A C.R.S. (1988).

clearly put at risk to pay a § 1983 judgment against the CCIA.[12]

## VI.

Weighing the three applicable factors to determine whether the CCIA is a person or an arm of the state for § 1983 purposes, we conclude that the balance tips in favor of finding that the CCIA is not an arm of the state. Contrary to the CCIA's argument here, we find that the state treasury criterion alone is not dispositive. Further, our review of the enabling statute and the CCIA's history and structure persuades us that the CCIA was specifically designed to be autonomous from the state. The legislature easily could have defined the CCIA as part of the state if it so wished. Instead, it has chosen to model the CCIA after a private insurance company to the greatest extent possible. Certainly, the legislature gave no fair notice of intent to insulate the CCIA from all § 1983 suits in state court. Rather, the legislature distanced the state from the Authority.

Finding that the CCIA may be sued under § 1983 is consistent with our caselaw specifically protecting the ability of litigants to sue political subdivisions of the state when the law is unclear. For example, in *Bertrand v. Board of County Commissioners of Park County*, 872 P.2d 223 (Colo.1994), we held that because the Governmental Immunity Act was in derogation of common law, it must be strictly construed and unless immunity is clearly established, an entity is liable to suit. Similarly, under the facts of this case, sound public policy requires that any doubt be resolved in favor of allowing the § 1983 suit to proceed.

## VII.

In conclusion, we hold that the CCIA is not an arm of the state and is therefore a "person" that can be sued under 42 U.S.C. § 1983. To hold otherwise would allow the CCIA to enjoy the benefits of acting as a private enterprise without the associated costs and responsibilities. Accordingly, we reverse the judgment of the court of appeals

and direct that court to return the case to the district court for further proceedings consistent with this opinion.

Chief Justice VOLLACK dissents, and Justice KOURLIS joins in the dissent.

Chief Justice VOLLACK dissenting:

The majority holds that the Colorado Compensation Insurance Authority (CCIA) is not an arm of the state for Eleventh Amendment purposes and consequently is a "person" that may be sued pursuant to 42 U.S.C. § 1983 (1994). A review of the three factors used by the majority in making this determination leads me to a different result. Accordingly, I dissent.

### I.

Section 1983 provides that any "person" who, under color of state law, deprives an individual of his or her constitutional rights may be sued for damages. However, the United States Supreme Court has held that states, largely due to their Eleventh Amendment immunity, are not "persons" that can be subjected to § 1983 liability in actions filed in state courts. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64–66, 109 S.Ct. 2304, 2308–10, 105 L.Ed.2d 45 (1989). In determining whether a government entity should also be afforded immunity from suits brought pursuant to § 1983, federal courts have determined that government entities deemed to be arms of the state are entitled to enjoy the same immunity as the state itself. *See Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir.1996).

Although federal courts have relied upon a variety of factors in determining whether a political entity is an arm of the state, the majority analyzes this question using the following three "dominant" factors: (1) the characterization of the entity by state law; (2) the degree of autonomy the entity enjoys from state control; and (3) whether a judgment against the entity will ultimately be

---

**12.** Determination of which fund would pay an actual § 1983 judgment against the CCIA must

await a real case and would be decided in the first instance by the responsible administrators.

paid with state funds. Maj. op. at 1305.[1] In weighing these three factors as they relate to the CCIA, the majority concludes that "the balance tips in favor of finding that the CCIA is not an arm of the state." Maj. op. at 1311. I disagree.

### A.

Under the majority's first factor, the CCIA's enabling act indicates that the General Assembly's characterization of the CCIA is ambiguous. Section 8–45–101(1), 3B C.R.S. (1995 Supp.),[2] provides in relevant part that

> [t]here is hereby created the Colorado compensation insurance authority which shall be a body corporate and a political subdivision of the state. The authority shall not be an agency of state government, nor shall it be subject to administrative direction by any state agency except as provided in this article, and except for the purposes of the "Colorado Governmental Immunity Act" ... and except for inclusion in the risk management fund....

While section 8–45–101(1) defines the CCIA as "a political subdivision of the state," it also treats the CCIA as a state agency for purposes of the Colorado Governmental Immunity Act (Immunity Act) and the risk management fund. *See also* § 24–30–1502(5), 7 C.R.S. (1997) (including the CCIA within the risk management fund's definition of "state agency").[3] Besides treating the CCIA as a political subdivision and state agency, the General Assembly has also structured the CCIA to resemble a private insurance company. *See* § 8–45–115, 3 C.R.S. (1997); § 8–45–118, 3 C.R.S. (1997) (employers pay premiums into the CCIA fund, claims are received and processed by the CCIA, and disbursements are paid out of the CCIA fund); § 8–45–117, 3 C.R.S. (1997) (CCIA is subject to regulation by the commissioner of insurance); § 8–45–102(2), 3 C.R.S. (1997) (CCIA fund manager is authorized to act in the same manner "as the head of a private insurance company").

Because the General Assembly has simultaneously characterized the CCIA as a political subdivision, state agency, and private insurance company, any arm-of-the-state analysis based upon the state's characterization of the CCIA is destined to result in ambiguity. For this reason, the first factor presented by the majority offers little guidance in determining whether the CCIA is an arm of the state.[4]

### B.

A careful review of the second factor in the majority's analysis indicates that, despite having some of the characteristics of a private insurance company, the CCIA is far from autonomous.

Regarding personnel, the CCIA operates through a board of directors consisting of seven members, all of whom are appointed by the governor with the consent of the Senate. *See* § 8–45–101(2)(a), 3 C.R.S. (1997). Compensation for members of the board is set by the General Assembly at one

---

**1.** As the majority notes, no federal precedent supports limiting this court's analysis to three particular factors. *See* maj. op. at 1303.

**2.** Minor changes were made to this section in 1996 after the facts giving rise to this appeal arose.

**3.** Additionally, the evolution of the CCIA's given name evinces that the CCIA has been historically characterized as a state entity. *See* § 8–54–102(1), 3 C.R.S. (1973) (state compensation insurance fund); § 8–54–102.5(1), 3B C.R.S. (1986) (state compensation insurance authority); § 8–45–101(1), 3B C.R.S. (1996 Supp.) (Colorado compensation insurance authority).

**4.** Contrary to the majority's assertions, the CCIA cannot be categorized with municipalities and counties because it is not constrained by geographical boundaries and local issues. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401–02, 99 S.Ct. 1171, 1177–78, 59 L.Ed.2d 401 (1979) (seizing upon the importance of local characteristics of government entity.)

By filling in the gaps in coverage created when private carriers refuse to insure high-risk employers, the CCIA performs an important statewide function by providing affordable insurance "for the benefit of injured and the dependents of killed employees." *See* § 8–45–102(1), 3 C.R.S. (1997). In this sense, the CCIA more closely resembles a state agency than a municipality or county.

hundred forty dollars per diem plus expenses. *See* § 8–45–101(3), 3 C.R.S. (1997). Until 1987, all employees of the CCIA's predecessor, the state compensation insurance authority (SCIA), were state employees. *See* § 8–54–102.5(9), 3B C.R.S. (1986).[5]

The CCIA accepts all applications for insurance, regardless of risk. *See Bastian v. Martinez*, 698 P.2d 1373, 1374 (Colo.App. 1984); § 8–45–101(5)(e.5), 3 C.R.S. (1997) (the board shall not refuse to insure any employer due to risk of loss). Prior to 1987, the executive director of the department of labor and employment was responsible for setting the rates for CCIA insurance. *See* § 8–54–105, 3B C.R.S. (1986). While rate-setting discretion now rests with the board, section 8–45–106, 3 C.R.S. (1996 Supp.), limits that discretion by requiring the board to provide its insurance at cost and set "the lowest possible rates of premium consistent with the maintenance of a solvent state compensation insurance authority fund." Section 8–45–107, 3 C.R.S. (1997), further limits the board's discretion by providing the board with its basis for setting rates.

The CCIA's legislative scheme also calls for considerable state oversight. Section 8–45–121(1), 3 C.R.S. (1997), provides that the CCIA fund "shall be open to visitation by the commissioner of insurance at all reasonable times." The commissioner of insurance is also required to conduct an examination of the CCIA fund at least once every three years and report his or her findings to the governor, General Assembly, and department of labor and management. *See* § 8–45–121(4), 3 C.R.S. (1997). Each year, the state auditor conducts an audit of the CCIA's financial condition and submits a report, complete with recommendations and comments, to the governor, General Assembly, and department of labor and management. *See* § 8–45–121(2), 3B C.R.S. (1996 Supp.). Finally, the CCIA fund manager is required to submit an annual report to the governor and joint budget committee regarding the business operations, resources, and liabilities of the CCIA fund. *See* § 8–45–122, 3B C.R.S. (1996 Supp.).

As to control over the CCIA fund itself, the state treasurer serves as its custodian and is responsible for investing any portion of the fund, including its surpluses and reserves, which is not needed for immediate use. *See* § 8–45–118(1), 3 C.R.S. (1997); § 8–45–120(1), 3 C.R.S. (1997). This court has also limited the CCIA's autonomy over the fund. *See Denver Area Labor Fed'n, AFL–CIO v. Buckley*, 924 P.2d 524, 529 (Colo.1996). In *Buckley*, this court held that section 1–45–116(1)(a), 1B C.R.S. (1996 Supp.), of the Campaign Reform Act prohibits the CCIA from expending its "public moneys" on certain political activities. *See Buckley*, 924 P.2d at 529. In so holding, this court explained that "[w]hile moneys collected by the [CCIA] are not derived from state-imposed sales, use, property, or income taxes, those moneys may be spent by the CCIA only for authorized public purposes." *Id.* at 528.[6] *Buckley* therefore places a dual limitation on the CCIA's autonomy by defining the CCIA fund as "public moneys" even though the CCIA fund is derived from private sources, and by restricting the use of the CCIA fund to "authorized public purposes."

The CCIA's enabling act reflects that, although the General Assembly has patterned the CCIA after a private insurance company, the CCIA resembles a private insurance company only when it is convenient for administrative purposes. Otherwise, the state has substantial control over all facets of the CCIA's operation. Viewing the enabling act in combination with this court's willingness to treat the CCIA as a public entity, the CCIA clearly does not function as an autonomous entity despite its seemingly private form.

### C.

The third factor the majority sets forth in determining that the CCIA is not an arm of

---

**5.** CCIA employees are no longer considered state employees; however, section 8–45–101(9), 3 C.R.S. (1997), provides that anyone employed by SCIA prior to July 1, 1987, could elect, before July 1, 1992, to retain their state employee status.

**6.** I filed a dissent to the majority's opinion in *Buckley* to state my position that the moneys collected by the CCIA are not public funds subject to section 1–45–116(1)(a). See *Buckley*, 924 P.2d at 530–33 (Vollack, C.J., dissenting).

the state concerns whether the state is ultimately liable for a judgment, if rendered, against the CCIA. As the United States Supreme Court recently explained in *Regents of the University of California v. Doe,* —— U.S. ——, ——, 117 S.Ct. 900, 904, 137 L.Ed.2d 55 (1997), "the question whether a money judgment against a State instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued." *See also Austin v. State Indus. Ins. System,* 939 F.2d 676, 678 (9th Cir.1991) (explaining that potential impact on the state treasury is a "central concern" in an Eleventh Amendment inquiry). These cases suggest that the question of whether the state is obligated to pay a judgment rendered against the state entity is of critical importance to any Eleventh Amendment analysis.

As set forth above, section 8–45–101(1) provides in part that the CCIA "shall not be an agency of state government . . . except for the purposes of the 'Colorado Governmental Immunity Act' . . . and except for inclusion in the risk management fund." In other words, the CCIA *is* considered a state agency for liability purposes and enjoys the protections of both the Immunity Act and the risk management fund. *See* § 24–30–1502(5) (defining the term "state agency" to include the CCIA for purposes of the risk management fund). While the Immunity Act concerns state law causes of action, the risk management fund protects state agencies from suits brought pursuant to federal law. *See* § 24–30–1510(3)(a), 7 C.R.S. (1997). Therefore, the General Assembly has chosen to expressly designate the CCIA as a state agency in situations where it is sued under federal law—precisely the situation posed by the present case.

The General Assembly's unwillingness to subject the CCIA to responsibility for a § 1983 judgment is also evident from the manner in which the CCIA collects funds. Because it must provide its subscribers with at-cost insurance, the CCIA is unable to generate additional revenue to satisfy § 1983 judgments. *See* § 8–45–106. This problem is further exemplified by the manner in which the CCIA is required to set its rates. *See* § 8–45–107(2).[7] These statutes indicate that the General Assembly has not only chosen to assume responsibility for a § 1983 judgment rendered against the CCIA, but it has also refused to give the CCIA the means to afford the financial burden that comes with such a judgment.

The majority seizes upon language in section 8–45–102(1) which provides that "[s]uch administration shall be without liability on the part of the state, beyond the amount of said fund" to support its conclusion that the General Assembly apparently intended to shield itself from CCIA liability. This assertion is flawed in two respects. First, the above-quoted reference in section 8–45–102(1) is clearly limited to the "administration" of the CCIA fund, which would presumably only cover claims made under CCIA insurance policies. Second, reading this statute in such a manner renders the multiple statutes classifying the CCIA as a state agency for purposes of the Immunity Act and risk management fund meaningless. *See Rodriguez v. Schutt,* 914 P.2d 921, 925 (Colo. 1996) (explaining that a court must read and consider a statute as a whole to give consistent, harmonious, and sensible effect to all of its parts).

The majority ignores the more relevant section 8–45–103(2), 3 C.R.S. (1997), which provides in part as follows:

The manager shall manage and conduct all business and affairs . . . in the name of the [CCIA], and in that name . . . the manager may:

(a)(I) Sue and be sued in all the courts of this state . . . in actions arising out of

---

7. Section 8–45–107(2) provides:

The rates so made shall be that percentage of the payroll of any employer which, on the average, shall produce a sufficient sum to:

(a) Carry all claims to maturity such that the rates shall be based upon the reserve and not upon the assessment plan;

(b) Produce a reasonable surplus as provided in articles 40 to 47 of this title, and to cover the catastrophe hazard, and to insure the payment to employees and their dependents of the compensation provided in said articles.

any act, deed, matter, or thing made, omitted, entered into, done, or suffered in connection with the [CCIA] fund and the administration, management, or conduct of the business or affairs relating thereto; and the manager shall be authorized to employ counsel to represent the fund in any action.

(II) Nothing in this paragraph (a) shall be construed to waive any provisions of the "Colorado Governmental Immunity Act" ... *nor shall it be construed to waive immunity of the state of Colorado ... guaranteed by the eleventh amendment to the constitution of the United States.*

(Emphasis added.) The meaning of section 8–45–103(2)(a)(II) is clear. While section 8–45–103(2)(a)(I) allows the CCIA to sue and be sued for acts arising out of its "business or affairs," section 8–45–103(2)(a)(II) clearly provides that nothing in that section shall be construed to waive the CCIA's Eleventh Amendment immunity as a state agency.

The majority also contends that the third factor lends only limited support for finding that the CCIA is an arm of the state because it remains to be seen whether the CCIA or the state would actually pay such a judgment if rendered. However, federal law does not require that the state's obligation to pay be definite. In fact, several circuit courts have found organizations to be arms of the state even though the state's obligation to pay was only a possibility. *See Haldeman v. State of Wyoming Farm Loan Bd.,* 32 F.3d 469, 473–74 (10th Cir.1994) (explaining that "it is apparent that a monetary judgment would possibly be paid from state funds. It is this possibility which this court has previously recognized as an influencing factor."); *Austin,* 939 F.2d at 679 (finding that "[w]e cannot say that a monetary judgment against [the organization] inevitably would have an impact on the state treasury. However, this disclaimer is not fatal to [the organization's] claim of immunity").

The General Assembly's inclusion of the CCIA within the protections afforded by the risk management fund establishes conclusive support for finding that the CCIA is an arm of the state. Section 8–45–103(2)(a)(I) provides further support for this conclusion.

Contrary to the majority's assertions, the unanswered question of who would actually pay a judgment rendered against the CCIA has little, if any, bearing on whether the CCIA is an arm of the state.

### D.

Using the three factors presented in the majority opinion, I believe that the CCIA is an arm of the state deserving Eleventh Amendment immunity. Although the CCIA is defined as a political subdivision, the General Assembly has ambiguously characterized the CCIA as a hybrid political entity that possesses attributes of both a state agency and a private insurance company. The General Assembly has also limited the CCIA's autonomy by retaining substantial control and oversight over the CCIA's entire operation. Finally, the General Assembly has designated the CCIA as a state agency for liability purposes and included the CCIA within the protections of the risk management fund. Although the question of whether the state or the CCIA would bear the ultimate cost of a § 1983 judgment remains undecided, the fact that the state has agreed to pay such a judgment is compelling evidence that the CCIA is an arm of state.

The holdings of two federal circuit courts of appeal support this conclusion. *See Austin,* 939 F.2d at 679; *Lipofsky v. Steingut,* 86 F.3d 15, 17 (2d Cir.1996). In *Austin,* the Ninth Circuit Court of Appeals held that the Nevada State Industrial Insurance System was an arm of the state for Eleventh Amendment immunity purposes. *Id.* at 679. Similarly, the Second Circuit Court of Appeals recently held in *Lipofsky* that although the New York State Insurance Fund, "in certain respects ... functions similarly to a private insurer, we conclude that it is nonetheless a State agency entitled to Eleventh Amendment immunity." *Id.* at 16. As the majority's opinion suggests, we must follow federal law in considering this issue. Despite the majority's attempts to distinguish these cases, both stand for the proposition that state insurance authorities are arms of the state that deserve Eleventh Amendment im-

munity. In my view, there is no reason to disregard this federal precedent.

## II.

The CCIA is a state-created entity that serves the public function of providing workers' compensation insurance to all Colorado employers, regardless of risk. In my view, this entity is an arm of the state protected by the Eleventh Amendment. For this reason, I would affirm the court of appeals and uphold the trial court's dismissal of the § 1983 complaint. Accordingly, I dissent.

I am authorized to say that Justice KOURLIS joins in this dissent.